[No. S029174. July 19, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD GRIFFIN, Defendant and Appellant.

538

## COUNSEL

Lynne S. Coffin, State Public Defender, under appointment by the Supreme Court, Donald J. Ayoob, Assistant State Public Defender, Mary K. McComb and Manuel J. Baglanis, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, John G. McLean and George M. Hendrickson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—Defendant Donald Griffin appeals from a judgment of the Fresno County Superior Court imposing a sentence of death (Pen. Code, § 190 et seq.).[1] His appeal is automatic. (§ 1239, subd. (b).)

At the guilt phase of his initial trial, a jury found defendant guilty of the murder of Janice Kelly Wilson (Kelly), his 12-year-old stepdaughter, finding that he committed the murder under the special circumstances of felony-murder rape, felony-murder sodomy, and felony-murder lewd conduct, and also that he personally used a deadly or dangerous weapon, a knife. The jury also found defendant guilty of rape, sodomy, and lewd or lascivious conduct against Kelly. At the penalty phase, the jury fixed the punishment for the murder at death. The trial court rendered judgment, sentencing defendant to death for the murder, and staying imposition of sentence as to the rape, sodomy, and lewd conduct offenses.

In *People v. Griffin* (1988) 46 Cal.3d 1011 [251 Cal.Rptr. 643, 761 P.2d 103] (*Griffin I*), we affirmed the judgment as to defendant's guilt of these offenses and the related special circumstance and personal-use findings, but reversed the sentence of death because the trial court committed error under *People v. Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], by giving the so-called Briggs Instruction. That instruction informed the jury that

---

[1] All further unspecified section references are to the Penal Code.

the Governor could commute a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole, but did not inform the jury that the Governor similarly could commute a sentence of death as well. We remanded defendant's case for a new trial on the issue of punishment.

On remand, upon retrial of the penalty phase, a new jury again fixed defendant's punishment at death. The trial court rendered judgment, again sentencing defendant to death for the murder and staying imposition of sentence as to the rape, sodomy, and lewd conduct offenses.

For the reasons set forth below, we affirm the judgment.

## I. FACTS

In *Griffin I*, we summarized the evidence presented at the guilt phase of the initial trial as follows:

"Defendant conceded that he had killed his stepdaughter, 12-year-old Kelly . . . , but denied any sexual assault. The prosecution evidence was that defendant stopped by his wife's workplace in Kerman, California, about 7 p.m. on December 13, 1979, along with Kelly. He said they were going to his parents' house nearby, and they left. A few minutes after 10 p.m. he returned, saying that he had allowed Kelly to leave his parents' house for home in the company of a little girl wearing horn-rimmed glasses, but that Kelly had never returned home. He made several expeditions in search of Kelly during the evening and repeated this story of her disappearance. He reported to the police that Kelly was missing, that she had left in the company of a little Mexican girl wearing glasses. He said to several witnesses that if anyone had hurt Kelly, he would kill them.

"When the police received a radio report that an injured person had been found on a nearby rural road, they asked defendant to follow them to the police station. An officer coming on duty saw defendant in a cell latrine, on his tiptoes, straddling a washbasin, with his hands in front of him. The officer could not see what defendant was doing, as his back was facing the officer. When defendant turned around, he asked for paper towels, and dried his hands. The officer saw that defendant had a buck knife in a holster at his waist. Defendant went out again to search for Kelly. He returned to the police station later that night, wearing clean pants and a different jacket. An officer observed some spots of blood on his boots, and defendant said that they were oil spots and tried to wipe them off. The officer asked where defendant's knife was, and he said he had lost it during his search for Kelly.

"[Kelly's] body was discovered that night on the side of a rural road. The blouse and sweater were pulled up partially over her face, the back of her bra

was torn, the left shoulder strap had been torn loose, and one of the cups had been cut with a knife. The left leg was bent at an awkward angle, and the underwear and pants were pulled down below the hips. The left leg of the underwear was cut through. The pants were torn and had also been cut near the zipper. There were stab wounds in the neck and abdominal incisions from the pubic bone to the breast bone, exposing the internal organs. There was a large pool of blood nearby, and a bloody partial footprint. An officer returning from the scene thought that the print matched defendant's boots. An officer went out into the police parking lot and shone a light into the truck defendant had been driving all evening; there was blood on the floorboard on the driver's side and another bloody footprint which looked like the one at the scene and looked like it could have been made by defendant's boots. Later analysis of the blood in the truck showed that it was [Kelly's] unique blood.

"After defendant's arrest, he said, 'I think I need a psychiatrist.' Then on his way from the crime lab to booking, he said to an officer, 'Do you think I'll get 10 years for this?' When an officer took defendant out of his cell after the arrest, defendant said, 'Go ahead man, it's all right, why don't you just go ahead and kill me. It's all right, just go ahead and kill me.' To the officer transporting him from Kerman to Fresno, defendant said, 'Give me your shotgun so I can blow my head off. I'm a fool.'

"Dr. [Thomas] Nelson performed the autopsy and testified that the cause of death was strangulation and severing of the carotid artery. The abdominal incision occurred after death. It was his opinion that there had also been a rape and an act of sodomy. The hymen was partly torn and there was a little bleeding near the tear. There was also a small bruise near the opening of the vagina and a bruise of an inch and a quarter to an inch and a half near the tear in the hymen. This testimony was impeached with prior inconsistent statements; in his autopsy report Dr. Nelson had not mentioned any bleeding near the tear in the hymen, and had described the bruise near the tear as much smaller. He explained that the shape of the bruise had become clearer after the tissue had been fixed in formaldehyde.

"Dr. Nelson also testified that the anus was quite dilated, and he thought it had been stretched so far that it could not close. This testimony was impeached with his prior inconsistent statements; in his autopsy report he said the anus was somewhat 'prominent.' He explained at trial that this was a nicer word than dilated. At the preliminary hearing he said that the anus was somewhat dilated. He explained that he was not very precise in his speech. The doctor also testified that he took a fluid sample from the anus which showed no sperm, but which in his opinion showed the presence of prostatic acid phosphatase.

"Acid phosphatase is an enzyme which occurs in the body in both sexes, but it occurs at higher levels in the male prostate gland and is contained in seminal emissions. Dr. Nelson removed 0.1 milliliters of fluid from the anus. His technician, [Joyce] Gordon, diluted this with 0.2 milliliters of saline solution, and divided the sample in half. The first test on one-half of the sample showed 14.5 sigma units of acid phosphatase. The test on the other half, involving a chemical reaction with tartrate buffer, showed that of the total, 8.1 sigma units of the acid phosphatase was prostatic acid phosphatase.

"The defense experts testified that in the absence of sperm or physical injury to the anus, they would not use any level of acid phosphatase to express an opinion that there had been an act of sodomy. They also disputed the accuracy and reliability of the tartrate buffer test to identify acid phosphatase as prostatic acid phosphatase; one expert went so far as to say that the tartrate buffer test was worthless and that prostatic acid phosphatase could not be distinguished from any other acid phosphatase except electrophoretically. There was also a great deal of controversy among the experts on the conversion factor between sigma units and international units, and about dilution factors. One defense expert, using his conversion factor and dilution factor, found an amount of acid phosphatase which was below the minimum amount which the scientific literature said showed the presence of prostatic acid phosphatase. However, another of the defense experts agreed with the prosecution's dilution factors and used an even higher conversion factor, coming to a total well above the minimum which the literature said indicated the presence of prostatic acid phosphatase. He maintained, however, that high levels of the substance should not be used to support an opinion that there had been an act of sodomy in the absence of sperm or physical injury to the anus. The defense experts also testified that sperm breaks down faster than acid phosphatase, so with the levels of acid phosphatase found here, they would certainly expect to find sperm if there had been any seminal emission.

"The defense pathologist, Dr. [Paul] Herrmann, said that there was insufficient evidence to show either rape or sodomy, that the injuries which Dr. Nelson had described in his autopsy report were not indicative of rape, that dilation of the anus could be simply muscle relaxation after death and before rigor mortis, and that in a child of this age, he would expect much more injury if there had been a rape or act of sodomy. He thought that the injuries to the vagina could have been caused by a tampon (though the mother testified in rebuttal that the child had not started menstruating yet) or by a finger. He also thought that Dr. Nelson had erred in considering changes in tissue after fixation in formaldehyde, as the formaldehyde distorts the appearance of the tissue." (*Griffin I, supra,* 46 Cal.3d at pp. 1017–1020.)

In *Griffin I,* we summarized the evidence presented at the penalty phase of the initial trial as follows:

"Defendant was 30 years old at the time of the offense and had no prior convictions. There was no evidence of any prior misconduct; in fact, the prosecution presented no evidence at the penalty phase of trial.

"In mitigation, . . . defendant called his parents and other family members who described defendant's family background. Defendant had little schooling and had been placed in classes for slow learners. He left school at age 15 or 16 and started working as a laborer and security guard. He was considered cooperative and hardworking. Defendant was a loving stepfather to [Kelly] for seven years. However, at the time of the offense defendant's relationship with his wife had seriously deteriorated, in part due to financial difficulties. Defendant had been laid off a day or two before the offense.

"The evidence presented at the penalty phase of trial showed that there was no indication of any violence in defendant's nature, and no sign before the offense of the coming explosion. His friends and family were shocked, believing him incapable of such an act. There was also testimony that after the offense, defendant was extremely remorseful, asking that his own life be taken." (*Griffin I, supra,* 46 Cal.3d at pp. 1031–1032.)

At the penalty phase retrial, the People, in their case in aggravation, presented evidence similar to that introduced at the guilt phase of the initial trial. This evidence related circumstances of the crimes against Kelly, including expert testimony tending to establish the commission of rape and sodomy and specifically the crucial issue of penetration, as well as evidence of defendant's consumption of alcohol and possibly drugs, although not to the point of intoxication.

The People presented additional evidence, not introduced at the initial trial, relating to the crimes against Kelly, including evidence disclosing the following three matters. First, the owner of a slaughterhouse testified that some years prior to the crimes in question, defendant was employed at that establishment, and that sheep were slaughtered in a manner similar to the way Kelly's body was mutilated. Second, a police officer testified that some months preceding the commission of the crimes, defendant struck up a conversation with the officer, and the two men discussed how crimes—including rape—were investigated. Third, two of Kelly's friends and classmates testified that on the day the crimes were committed, Kelly acted unusual at school, and told one of them that defendant had been fondling her for some time and that she intended to confront him if he continued to do so.

The People also presented evidence of other violent criminal activity committed by defendant, which also had not been introduced at the initial trial. This evidence revealed the following. First, a few years prior to the

commission of the crimes against Kelly, John Hogan, who was the father-in-law of defendant's sister and the property manager of a house that defendant had rented and was in the process of vacating, approached defendant in front of the house, cursing him and telling him he still owed rent and would have to pay for damage he had caused to the premises. When defendant paid no attention, Hogan touched his shoulder. In response, defendant sprang up, pulled out a knife with a folding blade, flicked the blade open, and took a step toward Hogan. Defendant's sister stepped between the men, with her face to defendant and her back to Hogan. As Hogan continued to curse defendant, saying, "[W]ell, come on, come on," defendant repeatedly told his sister, "[G]et him away or I'll cut his throat" or "I'll kill him." After she told defendant to put his knife away and leave, he did so. Second, perhaps a year or two preceding the commission of the present crimes, defendant had engaged in lewd conduct on two separate occasions with four- or five-year-old Lisa B., his wife's niece by marriage. Once, defendant touched Lisa with his fingers in the area of her vagina; on the other occasion, he penetrated her vagina with his fingers and then flicked open a knife with a folding blade. Each time, he threatened harm to others if Lisa revealed what he had done.

In his case in mitigation, defendant presented evidence similar to what he had presented at the guilt phase of the initial trial relating to the rape, sodomy, and lewd conduct offenses that preceded his murder of Kelly, including expert evidence offered to raise a lingering doubt as to the element of penetration required for the commission of rape and sodomy.

Defendant also presented evidence bearing on his background and character. Some of this testimony, given by lay witnesses, was much like the evidence he presented at the penalty phase of his initial trial, describing his minimal schooling and placement in classes for slow learners, his departure from school in his early to middle teens in order to perform manual and essentially unskilled labor, his reputation as cooperative and hardworking, his loving care for Kelly, his seriously deteriorating relationship with his wife, and his financial difficulties during the period leading up to the commission of the crimes against Kelly, the loss of his job a day or two before the crimes were committed, and the remorse he subsequently expressed.

Additional testimony related to defendant's background and character was given by expert witnesses, and was substantial and far different from his evidence at the penalty phase of his initial trial. This evidence was to the following effect: Defendant suffered physical abuse as a child and youth under his father's harsh discipline. In addition, defendant repeatedly suffered severe and violent sexual abuse within an extended and pervasively aberrant family, which comprised the Sextons and the McDonalds as well as the Griffins, especially at the hands of his uncles Lonnie and Charles Sexton and

even from his own father. This abuse had various adverse consequences, including the translation of his experiences as a victim into an inclination to victimize others. Defendant was borderline mentally retarded and suffered from severe neuropsychological defects, profound learning disabilities, and a speech impediment. Defendant committed the crimes against Kelly during a "psychotic experience." According to defendant, after getting into his truck with Kelly, "he had an extremely weird experience in which he felt that he was being threatened by what looked like some sort of a monster that was trying to get at him"; "at that point he drew his knife and tried to defend himself against this weird monster that was taking over and then passed out"; and "sometime thereafter he came to and saw the body and got out of there." Lastly, according to expert testimony presented, defendant had performed well in prison and could be expected to continue to do so.

In rebuttal, the People presented evidence to show that defendant was not borderline mentally retarded and did not commit the crimes against Kelly during a psychotic experience. An expert witness testified that defendant was not psychotic when he committed the crimes and was not mentally retarded, and that the qualifying term "borderline" was psychiatrically "inappropriate." This expert witness further testified that when observed by several individuals shortly before and shortly after the commission of the crimes, defendant was behaving normally, whereas a "person who's suffering [from] a psychosis has a significant" and "usually quite obvious" "impairment" of appreciable duration. This witness added: "[T]hat theory that there was a monster is just ridiculous. There's no psychiatric disorder . . . that comes on in a half hour and goes in a half hour. There's also the inconsistency if he thought he were protecting himself from a monster with his knife, why would he have had sex with the monster, raped the monster, sodomized the monster before killing the monster." The expert witness concluded that defendant acted in a rational manner, intending to commit the crimes without being detected and to avoid suspicion thereafter.

Finally, in surrebuttal, defendant presented evidence concerning the poor grades he received in school, the resulting angry reaction from his father including spankings and insults, and defendant's inability to complete job applications.

As noted above, at the conclusion of the penalty phase retrial the jury again fixed the punishment at death.

## II. CLAIMS

Defendant raises several claims in an attempt to establish error requiring reversal of the judgment. As will appear, we conclude that the judgment must be affirmed.

## A. *Denial of Wheeler Motion*

After 12 jurors and two of four alternate jurors were selected and sworn for the penalty phase retrial, and in the midst of the selection of the two remaining alternate jurors, defendant moved, in his counsel's words, "for a mistrial . . . , under what is known as a *Wheeler* Motion," which the trial court understood as a motion based on *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] to dismiss all of the jurors and alternate jurors and to quash the remaining venire. In *Wheeler*, we held that a prosecutor's use of peremptory challenges to strike prospective jurors on the basis of membership in a cognizable group, including African-Americans, violates the right of a defendant under article I, section 16 of the California Constitution to trial by a jury drawn from a representative cross-section of the community. (*People v. Wheeler, supra,* 22 Cal.3d at pp. 276–277, & 280, fn. 26.) Defendant, who is European-American, asserted that the prosecutor struck, in his counsel's words, "every prospective black juror that has been called. And I have counted five"—the last being Prospective Alternate Juror G. R.[2] The trial court denied the motion, determining that it was "not timely" and additionally that there was no "prima faci[e] showing as to . . . the people that were excused."

At this point, the following colloquy ensued between the trial court and defendant's counsel. Counsel stated, "Your Honor, could I put on the record the last alternate who was excused was black. Mr. [G. R.]." The court responded, "I don't know. Was he? [¶] He appeared to be of minority [*sic*]. I can't say that he was black. I don't know. Was he? In your opinion?" Counsel replied, "Well, perhaps I should have inquired, but, yes, he certainly appeared to be black to me."

Selection of the alternate jurors then proceeded. After the two remaining alternate jurors were selected and sworn, the prosecutor volunteered a comment apparently disputing the number of African-Americans whom he had peremptorily challenged, and articulating a reason explaining his peremptory challenge of Prospective Alternate Juror G. R.: "And with respect to—assuming that [defense counsel] was correct in his opinion that Mr. [G. R.] was black, there were comments made by Mr. [G. R.] in his juror questionnaire about the responsibility of persons who are using drugs or otherwise intoxicated which are closely related to the issues or some of the issues, which I believe will be raised in this case. And [I] would have excused anyone with those attitudes." The trial court did not respond to the prosecutor's comment, but instead "point[ed] out for the record"—without

---

[2] As indicated in part II.C, one of the 12 sworn jurors was excused for cause after completion of the selection of the four alternate jurors.

contradiction or objection by defense counsel—"that Mr. [G. R.] was asleep during most of the voir dire. He was in the back row and I asked the bailiff to wake him up."[3]

Defendant now contends that the trial court erred by denying his *Wheeler* motion.[4]

■ Under *Wheeler*, there is a presumption that a prosecutor who employs a peremptory challenge against a prospective juror who is a member of a cognizable group does so for a purpose other than to discriminate. (*People v. Wheeler, supra,* 22 Cal.3d at p. 278.) If a defendant believes that the prosecutor is using a peremptory challenge for a discriminatory purpose, the defendant "must raise the point in timely fashion." (*Id.* at p. 280.) ■ At the threshold, the defendant must establish a "prima facie case of [purposeful] discrimination." (*Ibid.*) "First, . . . [the defendant] should make as complete a record of the circumstances as is feasible." (*Ibid.*) "Second, [the defendant] must establish that the persons excluded are members of a cognizable group . . . ." (*Ibid.*) "Third, from all the circumstances of the case [the defendant] must show a strong likelihood" (*ibid.*)—or, stated in other terms, must raise a "reasonable inference" (*id.* at p. 281; accord, *People v. Johnson* (2003) 30 Cal.4th 1302, 1306, 1312–1318 [1 Cal.Rptr.3d 1, 71 P.3d 270], cert. granted

---

[3] Subsequently, just prior to the hearing on defendant's automatic application to modify the verdict of death, the People made a motion seeking what they styled "augmentation of [the] trial record" in order, in pertinent part, to allow the prosecutor to articulate reasons for his peremptory challenges against prospective jurors or alternate jurors whom he believed were African-Americans. Defense counsel opposed the motion, arguing that the "record should stand on its own." The trial court denied the motion.

[4] In the course of proceedings to prepare the record on appeal, defendant applied for permission to prepare a settled statement essentially for the purpose of identifying which of the prospective jurors or alternate jurors whom the prosecutor peremptorily challenged were African-Americans and also to identify whether a certain prospective juror whom the prosecutor challenged for cause was African-American. We denied the application.

Defendant claims that to the extent the record on appeal is inadequate to support his claim of error as a result of our denial of his application for permission to prepare a settled statement, he has been denied meaningful appellate review in violation of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution and also the due process clause of the Fourteenth Amendment to the United States Constitution (see *People v. Alvarez* (1996) 14 Cal.4th 155, 196, fn. 8 [58 Cal.Rptr.2d 385, 926 P.2d 365]). We disagree. (1) A settled statement operates to make up for the absence of a reporter's transcript of oral proceedings (see Cal. Rules of Court, rules 7 & 36(b); see generally *Marks v. Superior Court* (2002) 27 Cal.4th 176, 192–197 [115 Cal.Rptr.2d 674, 38 P.3d 512]), and not to supply what was omitted from those proceedings (see *People v. Tuilaepa* (1992) 4 Cal.4th 569, 585 [15 Cal.Rptr.2d 382, 842 P.2d 1142], affd. *sub nom. Tuilaepa v. California* (1993) 512 U.S. 967 [129 L.Ed.2d 750, 114 S.Ct. 2630] [stating that the "settlement . . . process does not allow parties to create proceedings . . . which they neglected to [create] earlier"]). If the record on appeal is inadequate, it is defendant who is responsible, inasmuch as he failed to include in the oral proceedings at trial the information that he improperly sought to insert through a settled statement.

*sub nom. Johnson v. California* (2003) 540 U.S. 1045 [157 L.Ed.2d 692, 124 S.Ct. 817], cert. dismissed (2004) 541 U.S. 428 [158 L.Ed.2d 696, 124 S.Ct. 1833])—"that such persons are being challenged because of their group association rather than because of any specific bias" (*People v. Wheeler, supra*, 22 Cal.3d at p. 280). In order to demonstrate such a "strong likelihood," or raise such a "reasonable inference," the defendant "must show that it is more likely than not the [prosecutor's] peremptory challenges, if unexplained, were based on impermissible group bias" or purposeful discrimination. (*People v. Johnson, supra*, 30 Cal.4th at p. 1306; *id.* at p. 1318.) ▉ If the defendant succeeds in establishing a prima facie case of such discrimination, the prosecutor must articulate neutral reasons explaining the peremptory challenges in question. (*People v. Wheeler, supra*, 22 Cal.3d at pp. 281–282.) Ultimately, the defendant must prove purposeful discrimination. (See *id.* at pp. 278–282 [placing the "burden of proof" on the defendant].) If the defendant succeeds in proving such discrimination, the trial court must dismiss any jurors thus far selected and sworn, and quash any remaining venire. (*Id.* at p. 282.)

We conclude that the trial court did not err by denying defendant's *Wheeler* motion. We need not consider whether it erred in determining that the motion was untimely because, in any event, the trial court did not err in determining that defendant failed to establish a prima facie case of purposeful discrimination.

▉ When a trial court denies a *Wheeler* motion with a finding that the defendant failed to establish a prima face case of purposeful discrimination, we review the record on appeal to determine whether there is substantial evidence to support the ruling. (See, e.g., *People v. Farnam* (2002) 28 Cal.4th 107, 135 [121 Cal.Rptr.2d 106, 47 P.3d 988]; *People v. Jenkins* (2000) 22 Cal.4th 900, 993–994 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Crittenden* (1994) 9 Cal.4th 83, 116–117 [36 Cal.Rptr.2d 474, 885 P.2d 887].)[5] The record includes voir dire (see, e.g., *People v. Farnam, supra*, 28 Cal.4th at p. 135; *People v. Jenkins, supra*, 22 Cal.4th at p. 993; *People v. Crittenden, supra*, 9 Cal.4th at p. 116) as well as any juror questionnaires (see *People v. Boyette* (2002) 29 Cal.4th 381, 419–423 [127 Cal.Rptr.2d 544, 58 P.3d 391]). We sustain the ruling when the record discloses grounds upon which the prosecutor properly might have exercised the peremptory challenges against the prospective jurors in question. (E.g., *People v. Farnam, supra*, 28 Cal.4th at p. 135; *People v. Crittenden, supra*, 9 Cal.4th at p. 117.)

---

[5] Some of our decisions, including *People v. Davenport* (1995) 11 Cal.4th 1171, 1201 [47 Cal.Rptr.2d 800, 906 P.2d 1068], and *People v. Turner* (1994) 8 Cal.4th 137, 167 [32 Cal.Rptr.2d 762, 878 P.2d 521], have implied that a finding that a defendant failed to establish a prima facie case of purposeful discrimination is subject to review for abuse of discretion. Subsequent decisions, including those cited in the text, clarify that such a finding is examined for substantial evidence.

During voir dire, Prospective Alternate Juror G. R. stated that he never had served as a juror, had lived in Fresno approximately 14 years, worked as a track man for the San Joaquin Valley Railroad making repairs, was unmarried, and spent his leisure time playing basketball, and also implied that he could choose either death or life imprisonment with possibility of parole as the penalty for defendant, depending on the evidence to be presented at trial.

In his juror questionnaire, this prospective juror disclosed further information, including the following: G. R. was 19 years of age, was a recent high school graduate, and was the father of a 10-month-old daughter. Expressing a desire to become a highway patrol officer, G. R. stated that relatives and friends had been arrested for, charged with, or incarcerated for, the sale of drugs, and also stated that he had witnessed various crimes, including theft, the sale of drugs, and a shooting. As for his general attitudes regarding the use of drugs and alcohol, G. R. expressed beliefs that included the following: "[T]hey should stop selling alcohol because all it does it cause [sic] problems"; alcohol use affects individuals by "mak[ing] them do crazy things" and by causing them to "forget what happen [sic] the day before"; similarly, drug use affects individuals by "mak[ing] them do crazy things and hurt people" and by "caus[ing]" them "to do other crimes just to get some more"; drug users are more likely than others to be guilty of crimes with which they are charged, "[b]ecause they dont [sic] remember if they did it or not"; and "I don't like [drug use] because I have family members on it," adding that a drug user is a "person looking for an excuse." G. R. also made various other comments, expressing a belief that violent crime had increased recently because "[t]here are more crazy people because of drug users and gangs," and that the penalty of death is imposed "[r]andomly," whereas the penalty of life imprisonment without possibility of parole is "no good if they will never get out why live."

Having reviewed the record on appeal, we find substantial evidence to support the trial court's finding that defendant failed to establish a prima face case of purposeful discrimination. The record discloses grounds upon which the prosecutor properly might have made his peremptory challenge against G. R. First, he apparently had substantial acquaintance with persons engaged in criminal activity. Second, he held a negative view of the nature of the penalty of life imprisonment without possibility of parole as "no good," and a similarly negative view of the administration of the penalty of death as random. Third, his comments on various points suggested that he may have been lacking in attention, in conformity with the trial court's observation— uncontradicted and unobjected to by defense counsel—that G. R. was "asleep during most of the voir dire."[6] The foregoing constitutes substantial evidence

---

[6] Defendant apparently claims that under *People v. DeSantis* (1992) 2 Cal.4th 1198, 1233–1234 [9 Cal.Rptr.2d 628, 831 P.2d 1210], the trial court erred by failing to conduct any

supporting the trial court's finding that defendant failed to make a prima face case of purposeful discrimination.[7]

■ Defendant also contends that the trial court erred by denying his *Wheeler* motion insofar as the motion also implicated *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]. In *Batson*, which followed *Wheeler* by some eight years, the United States Supreme Court held that a prosecutor's use of a peremptory challenge to strike a prospective juror on the basis of membership in a cognizable group, including African-Americans, violates a defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution. (*Batson v. Kentucky, supra,* 476 U.S. at pp. 84–89.) *Batson* requires of defendant substantially the same prima face case of purposeful discrimination as is required by *Wheeler*. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 115–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; see also *People v. Johnson, supra,* 30 Cal.4th 1302, 1313–1314.) Because defendant failed to satisfy *Wheeler*, he likewise failed to satisfy *Batson*. (See *People v. Yeoman, supra,* 31 Cal.4th at pp. 115–118.)[8]

---

inquiry into whether Prospective Alternate Juror G. R. was asleep. In *DeSantis*, we concluded that the trial court did not err when it conducted a "self-directed inquiry" into whether certain jurors had fallen asleep. (*Id.* at p. 1234.) The trial court here conducted just such an inquiry when it noticed that G. R. was "asleep during most of the voir dire" and then "asked the bailiff to wake him up." The trial court was not required to do more.

[7] Our conclusion that there is substantial evidence to support the trial court's finding that defendant failed to establish a prima face case of purposeful discrimination would be no different were we to review the record on appeal relating to the three—not four, as claimed by defendant—other prospective jurors struck by the prosecutor's peremptory challenges, and the additional prospective juror struck by the prosecutor's challenge for cause, who defendant *now* represents *may have been* African-Americans: C. F., J. H., W. M., and V. P.

J. H., W. M., and V. P. were struck by peremptory challenge. V. P. made it plain that if she were sworn as a juror, she likely would not vote to impose the death penalty in this case. W. M. did so as well, and also expressed opposition to the death penalty generally. By contrast, J. H. indicated her rather strong support for the death penalty in the abstract, but at the same time stated that if she were a juror she probably could not vote to impose that punishment.

C. F. was struck pursuant to a challenge for cause. As discussed hereafter (*post,* pp. 560–561), C. F. was a warden at a state prison at which women condemned to death were incarcerated pending execution of sentence. C. F. stated that she would experience a personal and professional conflict of interest if she were to serve as a juror in a capital case at the same time as she participated in the administration of the death penalty. She indicated that she desired not to serve as a juror. In light of her statement, the prosecutor challenged her for cause, and the trial court excused her.

In view of the foregoing, it is clear that with respect to the excusal of these four prospective jurors, there is substantial evidence supporting the trial court's finding that defendant failed to establish a prima face case of purposeful discrimination.

[8] Defendant claims that the trial court's asserted error in denying his *Wheeler* motion resulted in a judgment of death violative of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. But, as we have concluded, the trial court's ruling was not erroneous.

B. *Excusal of Prospective Jurors for Cause Related to Capital Punishment*

Defendant contends the trial court erred under the impartial-jury guaranties of the Sixth Amendment to the United States Constitution and article I, section 16 of the California Constitution by excusing four prospective jurors at the penalty phase retrial because of their views on capital punishment. As we shall explain, we conclude that this claim lacks merit.

██ In *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the United States Supreme Court held that a prospective juror cannot be excused for cause based on his or her views on capital punishment without violating a defendant's right to an impartial jury under the Sixth Amendment, unless, as is pertinent here, the prospective juror made it "unmistakably clear" that he or she would "*automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case . . . ." (*Id.* at p. 522, fn. 21.) In *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], however, the court revisited *Witherspoon* and declared that the proper standard was "whether the [prospective] juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424.) ██ In *People v. Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250], we adopted the *Witt* standard as the test for determining whether a defendant's right to an impartial jury under article I, section 16 of the state Constitution was violated by an excusal for cause based on a prospective juror's views on capital punishment.

On the People's challenge, the trial court excused Prospective Jurors E. B., M. C., J. D., and C. F. for cause based on their views concerning capital punishment. The trial court found that each held views that would substantially impair the performance of her duties as a juror in accordance with the instructions and her oath.

██ Substantial evidence is the standard of review applicable to a finding on the potential effect of a prospective juror's views related to capital punishment. (E.g., *People v. Memro* (1995) 11 Cal.4th 786, 817–818 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *People v. Gordon* (1990) 50 Cal.3d 1223, 1262 [270 Cal.Rptr. 451, 792 P.2d 251].) The standard is the same for the threshold finding regarding the nature of such views: "Such a finding, we have stated, is generally 'binding' 'if the prospective juror's responses are equivocal . . . or conflicting . . . .' " (*People v. Ashmus* (1991) 54 Cal.3d 932,

962 [2 Cal.Rptr.2d 112, 820 P.2d 214]; see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1147 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Kaurish* (1990) 52 Cal.3d 648, 675 [276 Cal.Rptr. 788, 802 P.2d 278]; see also *People v. Clark* (1993) 5 Cal.4th 950, 1025 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) As we explained in *People v. Cain* (1995) 10 Cal.4th 1, 60 [40 Cal.Rptr.2d 481, 892 P.2d 1224]: "[W]e pay due deference to the trial court, which was in a position to actually observe and listen to the prospective jurors. Voir dire sometimes fails to elicit an unmistakably clear answer from the juror, and there will be times when 'the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.' " (Quoting *Wainwright v. Witt, supra,* 469 U.S. 412, 426.)

In this case, substantial evidence supports the trial court's findings that each of the prospective jurors in question held views concerning capital punishment that substantially impaired her ability to perform her duties.

Prospective Juror E. B. stated, alternately, that she could, and could not, vote to impose the death penalty. Although she stated that earlier in her life she strongly had supported the death penalty, she admitted that she presently entertained mixed feelings and was at a crossroads in her thinking, further revealing that she believed that it was wrong to impose the death penalty and that life imprisonment without possibility of parole was sufficient punishment. She added that she had been much affected by the recent deaths of her father and her mother, which occurred on the same day; that she had been unsettled by the execution of Robert Alton Harris, placing herself in his place in the gas chamber in her thoughts; and, lastly, that she had been unable even to have a gravely ill dog put down just three weeks earlier. The trial court reasonably could find substantial impairment in her reactions to each of these very different events.

Prospective Juror M. C. indicated that she would not want to take responsibility for voting for the death penalty and, upon further questioning, stated and reiterated that she did not know whether she *ever* could vote to impose the death penalty, regardless of the state of the evidence in a case.[9] In similar fashion, Prospective Juror J. D., although stating that she supported

---

[9] The relevant passage of M. C.'s voir dire reads as follows:

"Q [Prosecutor]: You can't answer that question about whether you believe there should either be such a death penalty?

"A: I don't know. I don't feel like I should make that decision if there should be.

"Q: Okay. Well, bearing that in mind, do you think then that you should make the decision about whether someone gets the death penalty or not?

"A: No.

"Q: Okay. Why do you think that you should not?

the death penalty generally, also stated she did not know whether she actually could vote to impose the death penalty—even in a case in which she had concluded that the defendant deserved the death penalty.[10] With respect to each of these prospective jurors, the trial court, having had the opportunity to observe the demeanor of each and to assess the degree of reluctance and apprehension expressed by each prospective juror in responding to questioning, reasonably could find that each prospective juror's views on the death penalty would substantially impair her ability to perform the duties of a juror in accordance with the trial court's instructions.

Lastly, Prospective Juror C. F. was the warden of a state prison at which women condemned to death are incarcerated pending execution. C. F. stated that in light of her professional responsibilities as warden and the potential adverse effect on conditions in her institution that might result if it became known she had voted to impose the death penalty, she would have difficulty imposing that punishment and did not know whether her employment would affect her choice of penalty.[11] The trial court, having heard C. F.'s responses and observed her demeanor, reasonably could find that her position and

---

"A: I wouldn't want to take that responsibility.

"Q: And feeling that way as you've described in these last few answers in a real case, do you think that you could ever impose the death penalty on another human being?

"A: I guess. I really—I can't say definite yes or no.

"Q: Please, if I'm not making myself clear, I'm not asking you how you would vote in this case because you couldn't know. You haven't heard the evidence.

"A: I know, it's if I could do anybody.

"Q: Exactly. And your best response is you don't know.

"A: I'm being honest.

"Q: And it's okay for you to feel that way. It's fine.

"A: Okay."

[10] The relevant passage of J. D.'s voir dire reads:

"Q [Prosecutor]: [L]et's assume . . . [y]ou've heard the evidence and it's just the kind of case you think [the death penalty is] deserved in. Because of your belief that hey, I can't be a person to make this decision, would you be able to? Would you be able to impose the death penalty?

"A: I don't know.

"Q: Even if it was a case that you thought deserves it you still might have a problem?

"A: Yes.

"Q: And that's the best you can tell us now, I don't know.

"A: I'm sorry.

"Q: I'm not giving you a hard time.

"A: I honestly do not know if I could impose that. I might be able to when I heard the evidence but I might not."

[11] The relevant passages of C. F.'s voir dire read as follows:

"Q [The Court]: Do you feel that you could listen to the evidence in this case, evidence as to mitigation, evidence of aggravation, and listen to the court's instructions before you make up your mind as to what you feel the appropriate punishment should be?

"A: I would have some difficulty with it, Sir.

"Q: In what way?

"A: As a Warden of a State prison, I am struggling with a—not only a personal and

responsibilities as warden would substantially impair her ability to perform the duties of a juror.

■ Defendant, maintaining substantial evidence does not exist to support the trial court's excusal of any of the prospective jurors in question, focuses on equivocal and conflicting responses by each of the four women in her juror questionnaire and on voir dire. As already explained, however, the trial court had the opportunity to observe the demeanor and to assess the degree of uncertainty and reluctance of each prospective juror and resolved any equivocal and conflicting responses in a manner that caused the court to conclude that each of these jurors' views or employment would substantially impair the juror's ability to make a penalty determination in accordance with the court's instructions. On this record, we have no reason or basis for second-guessing that finding. Contrary to defendant's suggestion, the fact that at some point each of these prospective jurors may have stated or implied that she would perform her duties as a juror did not prevent the trial court from finding, on the entire record, that each nevertheless held views or had employment responsibilities that substantially impaired her ability to serve.

Defendant also argues that the trial court failed to apply the appropriate standard in excusing the prospective jurors in question. The record does not support this assertion. With regard to one of the prospective jurors, the trial court expressly invoked the requisite standard. As for the others, the court did so by implication. Defendant's point seems to be that the trial court must have failed to apply the appropriate standard because substantial evidence does not exist to support its excusal of any of these prospective jurors. But as

---

professional kind of conflict. I currently house the condemned row for women at my prison and as a result, my position has always remained that I am charged by the State to carry out whatever the penalties are. And I struggle then with the potential of being responsible for not only carrying it out, but imposing it. [¶] . . . [¶]

"Q [Prosecutor]: [Ms. C. F.], you told us a little bit about a conflict you feel between being a juror in a capital case and your employment. Do you think that conflict would impact upon your choosing between the two possible sentences in a case like this?

"A: I would hope not, but I could not honestly tell you that today. [¶] . . . [¶]

"Q [The Court]: Let me ask a couple questions if I may [Ms. C. F.]. If you sat on this jury, do you feel that the inmates in your institution would find out that you had sat on a death penalty case?

"A: Yes.

"Q: Do you feel there is a possibility of an uprise in your institution if they found out that you voted for the death penalty?

"A: Not an uprise but I believe it would cause problems. An uprise is a very serious word for a prisoner.

"Q: Well, yes, it is. Do you feel that whatever took place in the institution as a result of you sitting on a jury and possibly casting a vote for the death penalty, that would cause you personal problems at your institution?

"A: Yes."

we have explained, substantial evidence supports the trial court's action in excusing each of the jurors in question.[12]

## C. *Failure to Reopen Jury Selection*

Moments after the 12 regular jurors were selected and sworn at the penalty phase retrial, and prior to the selection of any of the four alternate jurors, one of the 12 jurors, E. L., who the record reflects was "hysterical" and "in tears," asked to be discharged because her son had been arrested, adding, "I have too many things on my mind. I can't even think." The trial court, outside the presence of the other jurors and prospective alternate jurors, questioned E. L. concerning her situation. E. L., who remained distraught, responded that her son had been arrested for seven armed robberies four days earlier, apparently after the conclusion of the last court session. When the trial court asked why she had failed to bring the fact to its attention earlier that day, E. L. replied, "I didn't even know I could say anything about it. I just can't do this." The trial court addressed the prosecutor and defense counsel: "I suspect that what we should do is to—if you stipulate that she can be excused, we'll seat the alternates and then select an alternate to replace her at this point in time. The jury has been sworn in."

After asking Juror E. L. to leave the courtroom, the trial court engaged in colloquy with the prosecutor and defense counsel. The prosecutor stated that "[t]he jury's been sworn and in a hypertechnical sense, jeopardy is attached and/or at least there's an argument to be made for that." The trial court asked the prosecutor, "Well, would you stipulate she could be excused and we could then seat her [replacement] and there would be no challenges to the other eleven but only as to this one seat?" The prosecutor responded with his view that "defendant personally [should] be part" of any such stipulation. Defense counsel interjected that defendant could not do so. The trial court replied, "Well, all [the prosecutor] is suggesting is that . . . whatever procedure we use . . . your client personally agree as to what procedure we're going to go through." "If there's a stipulation that [E. L.] . . . be excused, we re-seat a new juror to take this juror's place before we start selecting the alternates. That your client stipulate to it . . . . That's all [the prosecutor] is suggesting." Defense counsel asked for an opportunity to research the question, and the trial court ordered a recess for that purpose.

---

[12] We reject defendant's claim that the trial court's asserted error in excusing the prospective jurors in question for cause violated his rights both under the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution and the due process clause of the Fourteenth Amendment, as well as under the analogous clauses of article I, sections 1, 7, and 15 of the California Constitution. As we have concluded, the trial court's excusals were not erroneous.

Following the recess, defendant moved for a mistrial. Defense counsel stated: "Jeopardy has attached, the jury was sworn. The defense is also at a significant disadvantage. We have used sixteen peremptory challenges. We have had twenty-six to use. If . . . juror [Ms. E. L.] . . . had said that five seconds before, we would still have those ten peremptories to use plus the ones on the alternates, and we feel that this is a significant disadvantage to the defense . . . ." The trial court inquired: "Well, aside from the mistrial, would you stipulate to excusing this juror at this time and reopening and proceeding to select a person to sit in [her place] . . . ?" Defense counsel responded: "Your Honor, not giving up any issues on the mistrial issue, which I think is preserved at this point, is the court saying would we agree to—would we feel we are not in so much of a disadvantage—" The trial court interrupted: "No, I'm asking if you want to stipulate to this procedure, the procedure you suggested. Now if you stipulate to it then you are giving up your advantage and your objection." Defense counsel replied: "No."

Invited by the trial court to comment on the procedure to be followed, the prosecutor expressed his position that the trial court should select and swear the intended four alternate jurors, and then should turn to considering whether to discharge Juror E. L. and, if she were discharged, replacing her with one of the alternate jurors. In response, defense counsel stated: "Your Honor, for the record, the defense would like to indicate that I believe this decision has already been made by the court. That they are going to excuse that juror . . . ." The trial court cited its authority in section 233 (mistakenly transcribed or referenced as section 234) of the Code of Civil Procedure to put an alternate juror in the place of a juror who has been discharged. Defense counsel responded: "The difference I see we have before us, your Honor, is we don't have any alternates." The trial court replied: "I understand that and we're in the process of obtaining the alternates. And the court is therefore going to proceed to select the alternates and then we'll seat the alternates, seat one of the alternates to replace juror [E. L.] . . . . We'll select four alternates. Each . . . side will have one peremptory per alternate, that means four peremptories."

The prosecutor requested clarification: "If I understood your comments correctly a few moments ago when you were speaking with the defense here on the record, that you were making available or offering to them the procedure whereby we reopen jury selection so that they could proceed with whatever the peremptories were that were remaining if they opted to avail themselves to that procedure that was available to them?" The trial court responded: "Well, it was except they declined it and still insisted on the mistrial." The prosecutor stated: "Right. I understand. That's what I thought had occurred there." Defense counsel made no statement.

The trial court continued: "And then the procedure after we seat the alternates, first alternate will replace juror [E. L.] . . . if we get to that point and juror [E. L.] . . . is excused. Then if . . . another juror wishes to be excused during the course of the trial, alternate number 2 will replace and then alternate number 3, and then alternate number 4. Any objection to that procedure?" Defense counsel and the prosecutor each answered, "No."

Thereupon, in open court the four alternate jurors were selected and sworn. Immediately thereafter, the trial court conducted a hearing in chambers as to whether to discharge Juror E. L. The trial court questioned E. L. as previously, concerning her son's recent arrest, and E. L. continued to indicate she was too distraught to serve as a juror. The trial court then asked the prosecutor and defense counsel whether they would stipulate to E. L.'s discharge. Defense counsel answered: "Your Honor, the Defense can't do that at this time." The trial court responded: "All right, . . . then we'll keep [Ms. E. L.] on as a juror. Is that what you want?" Defense counsel replied: "No. I think it's the Court's decision." Upon further questioning by the trial court and the prosecutor, E. L. responded, "I can't do this right now. I am very emotional" and "I don't know if I could [do it]" even weeks later. The trial court discharged E. L. as unable to perform her duty, noting later its "opinion that she could not pay attention to the evidence based on her emotional state," and replaced her with an alternate juror. The trial court then admonished the jury and the remaining three alternate jurors, and excused them for the day.

Defendant again moved for a mistrial. Defense counsel stated: "We had asked for a mistrial earlier, but that was before [Ms. E. L.] had been excused. [¶] We would ask for a mistrial now, because we did not stipulate or agree to have [Ms. E. L.] be excused and the jury was sworn and then the alternates were picked right after the jury was sworn. [¶] This is on the record already. [¶] [Ms. E. L.] indicated a problem with serving as a juror and we are still of the same mind, we feel that a mistrial should be granted and should be granted at this time in this case." The trial court denied the motion.

Subsequently, after the jury returned its penalty determination and just prior to the hearing on defendant's automatic application to modify the verdict of death, defendant moved for a new trial, in pertinent part effectively renewing his mistrial motions. The trial court denied the new trial motion, stating as to the mistrial motions that the court "stands by its ruling[s]."

On appeal, defendant does not contend the trial court erred by discharging Juror E. L. Instead, defendant claims that the trial court erred by failing to reopen jury selection completely, in order to allow him to exercise his remaining peremptory challenges against jurors already sworn.

The legal principles applicable to the claim before us are set out in our decisions in *In re Mendes* (1979) 23 Cal.3d 847 [153 Cal.Rptr. 831, 592 P.2d 318], *People v. Armendariz* (1984) 37 Cal.3d 573 [209 Cal.Rptr. 664, 693 P.2d 243], and *People v. Caro* (1988) 46 Cal.3d 1035 [251 Cal.Rptr. 757, 761 P.2d 680].

In *Mendes*, we held that jeopardy does not attach for purposes of the double jeopardy clause of either the Fifth Amendment to the United States Constitution or article I, section 15 of the California Constitution until empanelment of the jury is complete, which entails selecting and swearing in not only the 12 regular jurors but also any alternate jurors. (*In re Mendes*, *supra*, 23 Cal.3d at pp. 852–854.) We further held that discharge of a regular juror before empanelment of the jury has been completed—with the selection and swearing-in of the alternate jurors—does not amount to discharge of the jury for double jeopardy purposes. (*Id.* at pp. 852–856.)

In *Mendes*, we also concluded that when the trial court discharges a regular juror prior to the selection and swearing in of any alternate jurors, the court possesses authority to reopen jury selection completely to allow each of the parties to exercise any peremptory challenges remaining against any of the remaining regular jurors already sworn. (*In re Mendes*, *supra*, 23 Cal.3d at p. 855.) In reaching this conclusion, we observed that inasmuch as the "composition of the 12-member panel [would] . . . change," there could be a "valid reason" for the trial court to allow the parties to exercise their remaining peremptory challenges against remaining regular jurors already sworn in order to "satisfy themselves to the best of their ability with the final composition of the jury." (*Ibid.*)

Next, in *Armendariz*, we considered a claim by the defendant that, following the trial court's discharge of two regular jurors prior to the selection and swearing in of the alternate jurors, the trial court erred by denying the defendant's motion to completely reopen jury selection to allow him to exercise his remaining peremptory challenges against the remaining regular jurors already sworn. Applying the abuse-of-discretion standard (*People v. Armendariz*, *supra*, 37 Cal.3d at p. 581), we found that the trial court in that case was unaware of its authority to reopen jury selection, and that had it been aware of that authority, it could not reasonably have denied the defendant's motion (*id.* at pp. 581–583). On that ground, we reversed the judgment rendered against the defendant and remanded the matter for a new trial.

Thereafter, in *Caro*, we considered a claim by the defendant that the trial court erred by failing to reopen jury selection completely to allow him to exercise his remaining peremptory challenges against the remaining regular

jurors already sworn, following discharge of a regular juror prior to the selection and swearing of the alternate jurors. In light of the procedural posture of that case, however, we rejected the defendant's argument, concluding that a trial court does not have a duty to reopen jury selection sua sponte, that is, on its own initiative in the absence of a request by the defendant (*People v. Caro, supra,* 46 Cal.3d at p. 1046). We therefore held that a defendant "may not be heard to complain" of any such omission on appeal unless he or she requested such action by the trial court (*id.* at p. 1047). Because the defendant in *Caro* had not asked the trial court to reopen jury selection, we concluded he could not complain on appeal of the trial court's failure to do so.

Applying the principles set forth above in *Mendes, Armendariz,* and *Caro,* we reject defendant's claim that the trial court in this case erred by failing to reopen jury selection completely in order to allow him to exercise his remaining peremptory challenges against the remaining regular jurors already sworn, following the discharge of Juror E. L. and prior to the selection and swearing in of the alternate jurors. As in *Caro,* defendant did not seek any such action from the trial court. What defendant in fact did seek, twice, was a mistrial—under what defendant now concedes was the erroneous belief that jeopardy had attached. In support of a mistrial, defense counsel cited the assertedly "significant disadvantage to the defense" flowing from the circumstance that had the 12 regular jurors not been selected and sworn, the defense would have had 10 remaining peremptory challenges for use against any prospective jurors called to voir dire for Juror E. L.'s seat as a regular juror, in addition to the four peremptory challenges available for use against any prospective jurors summoned to voir dire as potential alternate jurors. When the trial court inquired of defense counsel whether they were willing to stipulate to the procedure that the trial court believed they had suggested— that is, to reopen jury selection—defense counsel responded in the negative. Any uncertainty in this regard was dispelled later when, in response to the prosecutor's request for clarification, the trial court stated—*without contradiction by defense counsel*—that defense counsel had "declined" what the prosecutor described as the "procedure whereby we reopen jury selection so that they could proceed with whatever the peremptories were that were remaining." Thus, not only did defendant not seek to reopen jury selection, he in fact actively opposed such action, and his two motions for mistrial were not the equivalent of a request that the trial court do otherwise.

In support of his claim, defendant argues that the trial court was unaware of its authority to reopen jury selection completely in order to allow each of the parties to exercise remaining peremptory challenges against remaining regular jurors already sworn. The argument, however, does not establish that the trial court erred in failing to take such a course. Although the trial court provided an opportunity for counsel to research this issue, defense counsel

did not even cite *Mendes*, *Armendariz*, or *Caro*. More importantly, under *Caro*, which had been decided some years earlier, the trial court did not have a sua sponte duty to reopen jury selection. Defendant did not request such action, and the trial court was not under any obligation to act on its own initiative.

Defendant alternatively argues that the trial court improperly required him to withdraw his first motion for mistrial as a condition of the court's exercising its authority to reopen jury selection completely so as to allow each of the parties to exercise its remaining peremptory challenges against the remaining regular jurors already sworn. Defendant relies upon the trial court's inquiry: "Well, *aside from the mistrial*, would you stipulate to excusing . . . juror [E. L.] at this time and reopening and proceeding to select a person to sit in [her place] . . . ?" (Italics added.) Contrary to defendant's assertion, we do not discern in the italicized phrase the imposition of any condition on defendant, improper or otherwise, but only an attempt to clarify whether defendant would accept the procedure proposed as an acceptable resolution short of mistrial.

Defendant finally argues that the trial court should not have continued the hearing on whether to discharge Juror E. L. until after the four alternate jurors were selected and sworn, having done so assertedly to avoid any discharge of the jury that might have been required by Code of Civil Procedure section 233.[13] But the trial court's action in continuing the hearing has no bearing on the resolution of the matter before us, inasmuch as under *Caro* the trial court did not have a sua sponte duty to reopen jury selection.[14]

---

[13] Code of Civil Procedure section 233 provides: "If, before the jury has returned its verdict to the court, a juror becomes sick or, upon other good cause shown to the court, is found to be unable to perform his or her duty, the court may order the juror to be discharged. If any alternate jurors have been selected as provided by law, one of them shall then be designated by the court to take the place of the juror so discharged. If after all alternate jurors have been made regular jurors or if there is no alternate juror, a juror becomes sick or otherwise unable to perform the juror's duty and has been discharged by the court as provided in this section, the jury shall be discharged and a new jury then or afterwards impaneled, and the cause may again be tried. Alternatively, with the consent of all parties, the trial may proceed with only the remaining jurors, or another juror may be sworn and the trial begin anew."

[14] Defendant claims that the trial court's asserted error in failing to reopen jury selection completely so as to allow him to exercise his remaining peremptory challenges against jurors already sworn violated his rights under the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, the impartial jury clause of the Sixth Amendment, and the cruel and unusual punishment clause of the Eighth Amendment, as well as his rights under the analogous clauses of article I, sections 7, 15, 16, and 17 of the California Constitution. But as we have concluded, the trial court's action was not erroneous.

### D. *Denial of Motion for Order Recusing the District Attorney's Office for Conflict of Interest*

Prior to the penalty phase retrial, defendant moved under section 1424 for an order recusing the district attorney's office based on an asserted conflict of interest arising out of that office's employment of Noemi Yolanda Summi. The People opposed the motion.

The trial court conducted an evidentiary hearing on defendant's motion. Summi testified at the hearing as follows: She currently was employed in the district attorney's office as an investigator with the civil section of the juvenile division in what she described as an extra-help, temporary position, having begun work there about seven months earlier. Her office was situated in a building located miles from the building in which the prosecutor's office was situated. Previously, she was self-employed as a private investigator; about three years earlier, she had been hired to work as an investigator for defense counsel representing defendant's brother Elzie Griffin when Elzie was charged with murder (with one or more special circumstance allegations) unrelated to the charges against defendant. She worked in that capacity for a year or so, during which time she also collaborated with an investigator who worked for defense counsel representing defendant. Along with six or seven other persons, she once attended a team meeting relating to defendant's case, but never engaged in any discussions about defendant's case with any person other than counsel representing defendant and the agents of those counsel. Since the beginning of her employment in the district attorney's office, she never had been approached by anyone in that office with any questions about defendant's case and she never had occasion to do any work whatsoever for that office with respect to defendant's case. Indeed, she believed that no one in the district attorney's office knew about her indirect involvement in defendant's case or her direct involvement in defendant's brother Elzie's case.

Following Summi's testimony, defense counsel presented argument, conceding that "it is apparent that there is no actual conflict in that . . . Miss Summi has not talked to . . . [the prosecutor] or anyone on his team or to anyone about the case," but adding that "[j]ust because Miss Summi has not spoken to anyone so there is no actual conflict, it doesn't mean there isn't an apparent conflict or appearance of impropriety."

The trial court denied defendant's motion to recuse the district attorney's office, stating: "I agree there is no actual conflict and any apparent conflict is simply that. It's clear from Miss Summi's testimony she has not spoken to anyone in the District Attorney's office concerning her former services on . . . [defendant's] case. In fact, her thinking is no one in the District Attorney's

office is even aware of the fact that she worked on that case." The trial court then admonished Summi, "specifically ordering [her] to not discuss this case at all with anyone from the District Attorney's office or anyone at all that is involved in this case, directly or indirectly involved in the prosecution of [defendant]."

In *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255 [137 Cal.Rptr. 476, 561 P.2d 1164], we held that a trial court has general statutory authority to order recusal of a member of a district attorney's office, and inferentially the office itself, for a conflict of interest. (*Id.* at pp. 261–265 ; see generally *People v. Eubanks* (1996) 14 Cal.4th 580, 590–594 [59 Cal.Rptr.2d 200, 927 P.2d 310].) In *Greer*, we further held that the applicable standard for the trial court's exercise of such authority is whether there exists a conflict of interest that "might prejudice [the conflicted person or entity] against the accused and thereby affect, or appear to affect, [its] ability to impartially perform [its] discretionary functions." (*Greer, supra*, 19 Cal.3d at p. 269; see generally *People v. Eubanks, supra*, 14 Cal.4th at pp. 590–591.)

After our decision in *Greer*, the Legislature added section 1424 to the Penal Code. That statute sets forth the procedure for a defendant to seek an order from the trial court recusing a member of the district attorney's office, or the office as a whole, for a conflict of interest. (See *People v. Millwee* (1998) 18 Cal.4th 96, 123, fn. 7 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Eubanks, supra*, 14 Cal.4th at p. 591.) The statute also makes a substantive change (see *People v. Millwee, supra*, 18 Cal.4th at p. 123, fn. 7; *People v. Eubanks, supra*, 14 Cal.4th at p. 591), replacing the standard set forth in *Greer* with a standard that, in its present form, provides that a trial court may not order recusal "unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial" (§ 1424, subd. (a)(1)). (See, e.g., *People v. Eubanks, supra*, 14 Cal.4th at p. 591; *People v. Conner* (1983) 34 Cal.3d 141, 147 [193 Cal.Rptr. 148, 666 P.2d 5].) A conflict of interest exists "whenever the circumstances of a case evidence a reasonable possibility that the [conflicted person or entity] may not exercise its discretionary function in an evenhanded manner." (*People v. Conner, supra*, 34 Cal.3d at p. 148; accord, *People v. Snow* (2003) 30 Cal.4th 43, 86 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 833 [118 Cal.Rptr.2d 725, 44 P.3d 102]; *People v. Millwee, supra*, 18 Cal.4th at p. 123; *People v. Eubanks, supra*, 14 Cal.4th at p. 592.) Whether characterized as "actual" or merely "apparent," a conflict requires recusal only if it is "so grave as to render it unlikely that [the] defendant will receive fair treatment during all portions of the criminal proceedings." (*People v. Conner, supra*, 34 Cal.3d at p. 148; accord, *People v. Snow, supra*, 30 Cal.4th at p. 86; *Hambarian v. Superior Court, supra*, 27 Cal.4th at p. 833; *People v. Millwee, supra*, 18 Cal.4th at p. 123; *People v. Eubanks, supra*, 14 Cal.4th at p. 592.)

On appeal, a trial court's ruling on a motion for an order recusing a member of the district attorney's office, or the office as a whole, for a conflict of interest is reviewed for abuse of discretion, and its findings as to any underlying facts are reviewed for substantial evidence. (*People v. Eubanks, supra*, 14 Cal.4th at p. 594.)

In the present case, we conclude that the trial court did not err by denying defendant's motion. In light of the facts set out in Summi's testimony, the trial court's denial of defendant's motion was supported by substantial evidence and did not amount to an abuse of discretion. The court reasonably determined, in effect, that there was no conflict of interest that would have rendered it unlikely that defendant would receive a fair trial. There was no showing as to what confidential information Summi might have obtained about defendant's case while working as an investigator on defendant's brother Elzie's case, other than what related to their "common upbringing." The evidence further established that Summi had not disclosed any such confidential information to anyone in the district attorney's office, and in light of the trial court's order there was no reasonable basis to believe she would do so in the future. Furthermore, although defendant argues that the trial court applied an erroneous standard in denying his motion, the record does not support that assertion. Both defendant and the People cited the proper standard to the trial court, and it is reasonable to conclude that the trial court applied that standard, even if it did not quote it exactly. In stating "there is no actual conflict and any apparent conflict is simply that," the trial court merely was responding to defense counsel, who had been first to use that language. Moreover, in context, the trial court's words imply its view that "any apparent conflict" arising out of the district attorney's employment of Summi would not render it unlikely that defendant would receive a fair trial.[15]

### E. *Granting of Motion to Permit the Presence of the Victim's Mother and Sister*

Prior to opening statements at the penalty phase retrial, defendant made a motion, apparently under section 777 of the Evidence Code, to exclude from the courtroom any witness not then testifying, in order to prevent such witness from hearing the testimony of others. The trial court granted the motion.

The People then made a motion of their own to permit the presence of Marvene Nordin, Kelly's mother, and Tamara Wilson, Kelly's sister, pursuant

---

[15] Because we conclude that the trial court did not err in denying defendant's motion for an order recusing the district attorney's office for a conflict of interest, we reject as well defendant's claim that the trial court's asserted error violated his rights under the United States Constitution, specifically the cruel and unusual punishment clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment.

to former section 1102.6. Former section 1102.6 provided in pertinent part that a "victim shall be entitled to be present and seated at the trial," unless the trial court "finds that the presence of the victim would pose a substantial risk of influencing or affecting the content of any testimony." (Former § 1102.6, subd. (a), as enacted by Stats. 1986, ch. 1273, § 2, p. 4448 and repealed by Stats. 1995, ch. 332, § 2, p. 1824; hereafter former section 1102.6.) Former section 1102.6 also defined "victim" as "(1) the alleged victim of the offense and one member of the victim's immediate family and (2) in the event that victim is unable to attend the trial, up to two members of the victim's immediate family who are actual or potential witnesses." (Former § 1102.6, subd. (e).) Nordin and Wilson were "victims" within the meaning of former section 1102.6, because Kelly was unable to attend and they were members of her family who were expected to be called as witnesses. Defendant opposed the motion; defense counsel, invoking experience with other trials, stated: "I would object strongly to having witnesses in the courtroom, reacting and letting the jury see their reactions." Noting that no witnesses then were present, the trial court took the motion under submission and stated it would make a ruling at a later time. Pending such a ruling, the trial court excluded from the courtroom any witness not then testifying.

In their case in aggravation, the People called Nordin, Kelly's mother, as their first witness. Nordin testified concerning such matters as her first marriage, the birth of her children, including Kelly, and her marriage to defendant and their life together, including observations that he appeared not to use drugs, but did consume alcohol—at least on one occasion to the point of intoxication. Nordin also testified about events that occurred on the night the crimes were committed against Kelly, including further observations that defendant was uncharacteristically upset, with tears in his eyes, and although smelling of alcohol did not act as though he was intoxicated or under the influence of drugs.

Later the same day, the People called Wilson, Kelly's sister, as a witness. Wilson also testified about events on the night in question, including observations that defendant was uncharacteristically upset and, although smelling of alcohol, did not act as though he were intoxicated.

The next day, the trial court returned to the People's motion to permit the presence of Nordin and Wilson as victims under former section 1102.6.

In arguing in favor of the motion, the prosecutor relied upon the language of former section 1102.6, which provides that a "victim shall be entitled to be present and seated at the trial" (former § 1102.6, subd. (a)). Although conceding that Nordin and Wilson might testify again in rebuttal, the prosecutor also noted that the two women already had testified, in conformity

with the spirit of a separate requirement of former section 1102.6, namely that on the granting of a motion of this sort, the "victim shall testify first" "if the defendant . . . object[s] to the order of the victim's testimony" (former § 1102.6, subd. (b)).

In opposition, defense counsel relied upon the language of former section 1102.6 that withdrew a victim's entitlement to be present in the event the trial court "finds that the presence of the victim would pose a substantial risk of influencing or affecting the content of any testimony." (Former § 1102.6, subd. (a).) Defense counsel likened the question to one of undue prejudice under section 352 of the Evidence Code: "[I]t's like a 352 issue would be brought to the case by having these people sit in court."

One of defense counsel's concerns related to the possibility of further testimony by Nordin or Wilson: "In a case like this, it would be our contention that to have two of the key witnesses present in court for all the testimony and probably being called in rebuttal later after having listened to everything in court, it's very, very prejudicial to our client and would overweigh any other considerations."

Another of defense counsel's concerns related to any reaction by Nordin or Wilson to evidence such as crime scene and autopsy photographs—an issue that the trial court had raised. For his part, the prosecutor had given his assurance that he would caution at least Nordin about the nature of the evidence. Defense counsel nevertheless was unsatisfied: "And I was personally present in another trial where the audience was admonished not to react and they did again and again after being admonished . . . . And the jury's attention was constantly brought to the audience and the reactions from the different evidence that came in which was very gruesome. And once it's done, it's too late is the problem. And it doesn't—in my opinion, if . . . [the prosecutor] talks to them, if the court admonishes them, it doesn't mean it's not going to happen."

Thereupon, the trial court granted the motion to permit the presence of Nordin and Wilson, but directed the prosecutor to "caution" them against "any emotional outbreak" and to instruct the two witnesses that "[t]hey will be given one opportunity only."

After the People completed their case in aggravation, defendant began his case in mitigation. Among defendant's witnesses was Nell Riley, Ph.D., a clinical psychologist with a specialty in neuropsychology, who testified that defendant was borderline mentally retarded and suffered from a speech impediment. Dr. Riley also testified that defendant was not malingering when he performed poorly during the testing to which she subjected him. Another

of defendant's witnesses, Harry Kormos, M.D., a psychiatrist, also testified that defendant was borderline mentally retarded. Dr. Kormos testified additionally that defendant was laboring under substantial stress at the time of the murder. In support, Dr. Kormos related various statements defendant had made to him indicating that Nordin put pressure on defendant to move up from lower paying employment that he enjoyed to higher paying employment for which he was unsuited; that she and her children ridiculed him as stupid; and that she had threatened separation.

Another of defendant's witnesses, James Chiminillo, taught defendant reading and mathematics while he was incarcerated on death row. Chiminillo testified that defendant started out at a first-grade, eighth-month, level in reading and at a third-grade, fourth-month, level in mathematics, and that although he worked hard, he did not make substantial progress. On cross-examination, Chiminillo was presented with an inmate/parolee appeal form, signed with defendant's name, that purportedly bore defendant's handwriting and that suggested by its contents that defendant functioned at a higher level than defendant revealed to Dr. Riley and therefore may have been malingering when he performed poorly during the tests she administered to him. Chiminillo, however, testified that he could not identify the handwriting as defendant's.

After defendant completed his case in mitigation, the People presented rebuttal. Among other witnesses, the People called Nordin. Nordin denied defendant's statement that she put pressure on him to move up to higher paying employment; she denied his statement that she or any of her children ridiculed him; and she denied his statement that she had threatened separation. Nordin also testified that defendant did not appear to be mentally retarded and could speak without impediment. In addition, Nordin identified handwriting on the inmate/parolee appeal form as defendant's. The People also called Wilson. Like Nordin, Wilson denied that she or any of the other members of Nordin's family ridiculed defendant, testified that he did not appear to be mentally retarded, and identified handwriting on the inmate/parolee appeal form as defendant's.

Defendant now contends that the trial court erred by granting the People's motion to permit the presence of Nordin and Wilson as victims under former section 1102.6.

■ The question of the appropriate standard of review for a trial court's ruling on a motion to permit the presence of a victim under former section 1102.6 has not been addressed in any reported decision. In resolving this question, we look to the standard of review for a ruling on a motion to exclude witnesses, as to which a ruling on a motion to permit the presence of a victim

operates as an exception. A ruling on a motion to exclude witnesses is reviewed for abuse of discretion. (See, e.g., *People v. Lariscy* (1939) 14 Cal.2d 30, 32 [92 P.2d 638]; *People v. Cooks* (1983) 141 Cal.App.3d 224, 330 [190 Cal.Rptr. 211].) We believe that the same standard should apply to a ruling on a motion to permit the presence of a victim. In making any determination as to who may attend or not attend a trial or any portion of a trial, a trial court exercises its authority over the course and conduct of the proceedings. (See § 1044.) The exercise of that authority in the making of such determinations generally is subject to review for abuse of discretion. (See *People v. Halbert* (1926) 78 Cal.App. 598, 613 [248 P. 969].) We see no reason to exempt from that rule a trial court's determination allowing the presence of a victim.

Applying the abuse-of-discretion standard, we find no error in the trial court's granting of the People's motion to permit the presence of Nordin and Wilson as victims under former section 1102.6. In light of the circumstances, the trial court reasonably determined that the presence of Nordin and Wilson would not pose a "substantial risk of influencing or affecting the content of any testimony." (Former § 1102.6, subd. (a).) Nothing before the trial court at the time it made its ruling suggested that Nordin's or Wilson's presence posed a substantial risk that either woman would craft or shape her own testimony, or cause any other witness to do so, as a result of her presence. In arguing against the motion on this point, defense counsel asserted only that such a risk existed, but an assertion of this sort is insufficient to support a claim that the trial court abused its discretion (see *People v. Bradford* (1997) 15 Cal.4th 1229, 1232 [65 Cal.Rptr.2d 145, 939 P.2d 259]). Further, although we review the trial court's ruling on the basis of the record of the proceedings before it at the time the ruling was made, we note that subsequent events do not suggest that either Nordin or Wilson tailored her testimony on rebuttal to conform with what she had learned from being present at trial, but instead show that each woman simply testified to matters she was likely to know without regard to what was disclosed at trial. In addition, subsequent events do not support any inference that either Nordin nor Wilson, by her presence, caused any other witness to give testimony different from what the witness otherwise would have given, inasmuch as even defense counsel characterized each woman as "very composed" and "very restrained."[16]

---

[16] Because we conclude that the trial court's ruling was not erroneous, we find no merit in defendant's related claim that the trial court's asserted error in granting the People's motion to permit the presence of Nordin and Wilson as victims under former section 1102.6 violated his rights under the following provisions of the United States and California Constitutions: (1) the due process clauses of the Fourteen Amendment and article I, section 15; (2) the impartial jury clause of the Sixth Amendment and analogous clauses of article I, sections 15 and 16; (3) the confrontation clauses of the Sixth Amendment and article I, section 15; and (4) the cruel and unusual punishment clauses of the Eighth Amendment and of article I, section 17.

### F. *Admission of the Victim's Precrime Out-of-court Statement*

In their case in aggravation at the penalty phase retrial, the People presented evidence, not offered at the initial trial, that on the day on which the crimes were committed, Kelly did not act as she usually did at school, and told another girl that defendant had been fondling her for some time and that she intended to confront him if he continued to do so.

The events leading to the admission of Kelly's statement were as follows. Michelle Acosta, who had been a friend and classmate of Kelly, was the girl to whom Kelly had made this statement. Not long after the murder, Acosta had spoken about Kelly's statement with someone whom she could not remember but did not mention the statement again for about 12 years until shortly prior to the penalty phase retrial when, after a chance meeting with an estranged sister of defendant's, she related it to a detective. It was only about three weeks prior to opening statements, shortly after trial commenced with jury selection, that the prosecutor learned of the existence of Acosta and of Kelly's statement to her. Within a day or two, the prosecutor notified defense counsel. A week or so later, defense counsel was provided an opportunity to interview Acosta.

In the course of the People's opening statement, the prosecutor began to make reference to Kelly's statement, but was cut off by an objection by defense counsel. Outside the presence of the jury, defense counsel argued that Kelly's statement was inadmissible because it was hearsay and did not fall within any exception to the hearsay rule, and also because it amounted to aggravating evidence of other violent criminal activity and had not been included in the pretrial notice required by section 190.3 for all such evidence except the circumstances of the murder. In response, the prosecutor argued that Kelly's statement was admissible because it fell within the exception to the hearsay rule for a statement of state of mind and also because it was not offered to prove other violent criminal activity, but rather constituted aggravating evidence of the circumstances of the murder. The trial court sustained the defense objection, but without prejudice to a later request by the People for a ruling as to the admissibility of Kelly's statement. The trial court then admonished the jury to "disregard the last sentence, the last subject of the . . . [prosecutor]."

Later that day, outside the presence of the jury, the People sought a ruling from the trial court that Kelly's statement was admissible. At an evidentiary hearing conducted outside the presence of the jury, the People called Acosta to testify. Acosta related Kelly's statement, making plain that she had asked Kelly—for 10 or 15 minutes or perhaps even longer—what was bothering her, before Kelly spoke of defendant's past fondling. Acosta added that she

had made various suggestions to Kelly leading up to Kelly's expression of her intent to confront defendant. The prosecutor argued that Kelly's statement was admissible because it fell within the exception to the hearsay rule for a statement of state of mind and also within the exception for a spontaneous statement. In addition, the prosecutor argued that Kelly's statement was not offered to prove other violent criminal activity by defendant, but rather constituted aggravating evidence of the circumstances of the murder. In opposition, defense counsel argued that Kelly's statement could not be deemed spontaneous because it was elicited by questioning and was not made shortly after the past fondling by defendant to which it referred. Defense counsel also argued that Kelly's statement, even if it reflected her state of mind, was irrelevant and unduly prejudicial.

The trial court ruled, again without prejudice to a later request by the People, that Kelly's statement was inadmissible. The trial court determined that Kelly's statement did not fall within the spontaneous-statement exception to the hearsay rule because it was elicited by questioning and also because it could not be said to have been made shortly after defendant's past fondling. The trial court further determined that Kelly's statement did not fall within the state-of-mind exception, essentially because it was preceded by the suggestions made by Acosta.

In their case in aggravation, the People proceeded to call Alma Torres. Torres testified before the jury that Kelly was her best friend and a classmate, and that at school on the day on which the crimes were committed, Kelly "just was different. She didn't want to eat lunch, she didn't want to play, she didn't want to do nothing. She wasn't mad at me, she was just upset. She didn't want to tell me what was wrong."

After Torres's testimony, outside the presence of the jury, the People again sought a ruling from the trial court that Kelly's statement was admissible. The prosecutor and defense counsel made arguments that were substantially similar to those they previously had made regarding the admissibility of Kelly's statements. At this time, stating that it had been "bothered by," and had "re-thought," its "prior ruling," the trial court reversed itself and ruled that Kelly's statement was admissible, determining that it fell within the spontaneous-statement and state-of-mind exceptions to the hearsay rule.

In light of the trial court's ruling, the People called Acosta as a witness. On direct examination, Acosta testified as follows: Acosta was a friend and classmate of Kelly. On the day on which the crimes against Kelly were committed, Acosta discovered Kelly in a corner of a school bathroom, attempting to avoid contact and crying so hard that she was shaking and unable to catch her breath. Acosta went over to Kelly and asked what was

bothering her, but Kelly did not answer immediately. After Acosta continued her inquiry for about 15 or 20 minutes, Kelly, still crying, finally responded that for some time defendant "was touching her places where she knew that it was wrong to be touched," and that "when she goes home from school and if . . . [defendant] was going to touch her places . . . that she knew . . . wasn't right, . . . she was going to tell him to quit," and that "if he wasn't, . . . she was going to . . . tell him that she was going to tell her mother." After this conversation, Acosta and Kelly returned to class, but thereafter when Acosta saw Kelly during the remainder of the school day, Acosta observed that Kelly did not act as she usually did, but was quiet and withdrawn. Defendant did not subject Acosta to cross-examination. In their respective summations to the jury, the prosecutor mentioned Kelly's statement only briefly, and defense counsel did not mention it at all.

 Defendant contends that the trial court's admission of Kelly's statement was error. The applicable standard of review is abuse of discretion, the test that governs the admissibility of evidence generally. "Underlying that determination [of admissibility] are questions of (1) relevance, (2) hearsay rule/state-of-mind exception, and (3) undue prejudice." (*People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

 The trial court reasonably determined that Kelly's statement was not subject to the requirement of pretrial notice in section 190.3 for the admissibility of aggravating evidence other than the circumstances of the murder. At the outset, we observe that notwithstanding its several clauses, Kelly's utterances constitute a single and entire statement. The references to defendant's past fondling of Kelly and Kelly's intent to confront defendant are inextricably linked to each other for their context and meaning. Kelly's statement constituted aggravating evidence of the circumstances of the murder, suggesting that later that same day Kelly confronted defendant and that in response defendant murdered her wilfully and with premeditation and deliberation in order to avoid apprehension for his continuing acts of molestation, and not simply in a senseless explosion of violence. If defendant believed the jury might use Kelly's statement to find he had engaged in violent criminal activity *other than* the murder and the accompanying rape, sodomy, and lewd conduct, he could have moved for an instruction limiting the use of the statement (see Evid. Code, § 355), but he was not entitled to have the statement excluded pursuant to section 190.3. Furthermore, even if the People had offered Kelly's statement to prove violent criminal activity *other than* the murder and the accompanying rape, sodomy, and lewd conduct without complying with the pretrial notice requirement of section 190.3, it would be difficult to conclude that defendant suffered prejudice from the asserted lack of prior notice inasmuch as the prosecutor had notified defense counsel about Kelly's statement more than two weeks prior to the prosecutor's reference to it in his opening statement, and defense counsel did not

request a continuance to respond (see, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 241 [66 Cal.Rptr.2d 123, 940 P.2d 710]).

The trial court also reasonably determined that Kelly's statement was relevant to the circumstances of the murder, that is, it had a tendency to prove what transpired (see Evid. Code, § 210), because it suggested that Kelly confronted defendant and that in response defendant murdered her wilfully and with premeditation and deliberation.

Likewise, the trial court reasonably determined that Kelly's statement was not unduly prejudicial. Although Kelly's statement of course was damaging to defendant's position by suggesting that he murdered her wilfully and with premeditation and deliberation, such damage does not amount to undue prejudice *for purposes of exclusion of evidence*. (See *People v. Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].) Relevant as it was to the circumstances of the murder, Kelly's statement carried a probative value that was not substantially outweighed by any threat to the fairness of the trial or the reliability of the outcome. (See *People v. Alvarez, supra,* 14 Cal.4th at p. 204, fn. 14.)

Finally, whether or not Kelly's statement fell within the spontaneous statement exception to the hearsay rule, the trial court reasonably determined that the statement fell within the state-of-mind exception, specifically to prove Kelly's future conduct in confronting defendant prior to the murder in accordance with the intent expressed in her statement.

For purposes of the state-of-mind exception to the hearsay rule, a statement of state of mind is one that (1) reflects the declarant's mental state, and (2) is offered, among other purposes, to prove the declarant's conduct (Evid. Code, § 1250, subd. (a)(2)), including the declarant's future conduct in accordance with his or her expressed intent (e.g., *People v. Majors* (1998) 18 Cal.4th 385, 404 [75 Cal.Rptr.2d 684, 956 P.2d 1137]; *People v. Alcalde* (1944) 24 Cal.2d 177, 185–188 [148 P.2d 627]), unless the statement was made under circumstances indicating lack of trustworthiness (Evid. Code, § 1252; see *id.,* § 1250, subd. (a)).[17]

---

[17] Evidence Code section 1250 provides:

"(a) Subject to [Evidence Code] Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant.

"(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

Here, Kelly's statement reflected her mental state, that is, her intent to confront defendant, even though the occurrence of such a confrontation itself depended on defendant's continued fondling (see *People v. Conrad* (1973) 31 Cal.App.3d 308, 325 [107 Cal.Rptr. 421]). Moreover, Kelly's statement was offered to prove her future conduct in accordance with the intent expressed in her statement, namely that she in fact confronted defendant prior to the murder. Lastly, Kelly's statement was not made under circumstances indicating a lack of trustworthiness, there being no hint of any "motive to misrepresent or to manufacture evidence" or any similar circumstance (Cal. Law Revision Com. com., 28B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1252, p. 303). Although evidence like Kelly's statement has been held to be "not admissible if it refers *solely* to alleged past conduct on the part of the accused" (*People v. Hamilton* (1961) 55 Cal.2d 881, 893–894 [13 Cal.Rptr. 649, 362 P.2d 473], italics added, overruled on another point by *People v. Wilson* (1969) 1 Cal.3d 431, 442 [82 Cal.Rptr. 494, 462 P.2d 22]; accord, *People v. Lew* (1968) 68 Cal.2d 774, 780 [69 Cal.Rptr. 102, 441 P.2d 942]), Kelly's statement did not refer solely to defendant's past fondling, but also referred to her own intent to confront him.

Even if we assume for the sake of discussion that Kelly's statement, although admissible to prove her confrontation of defendant, was inadmissible to prove defendant's past fondling, it would not have been rendered inadmissible on that basis. "When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose," a trial court is not required to exclude the evidence, but rather "upon request" is required to give a limiting instruction "restrict[ing] the evidence to its proper scope." (Evid. Code, § 355.) Here, defendant did not request a limiting instruction of any sort.[18] Although we have implied that even in the absence of such a request, a trial court nevertheless may be required to exclude such evidence when a limiting instruction would be ineffective (see *People v. Thompson* (1988) 45 Cal.3d 86, 104–105 [246 Cal.Rptr. 245, 753 P.2d 37]), in this case we cannot conclude that a limiting instruction would have been ineffective, particularly because in their respective summations to the jury the prosecutor mentioned Kelly's statement only briefly and defense counsel did not mention it at all.[19]

Evidence Code section 1252 provides:

"Evidence of a statement is inadmissible . . . if the statement was made under circumstances such as to indicate its lack of trustworthiness."

[18] We note that defendant does not claim that his objection and opposition to the admissibility of Kelly's statement amounted to a request for a limiting instruction, or that the trial court erred by refusing any such request.

[19] In addition to claiming that Kelly's statement was inadmissible under the applicable Evidence Code provisions, defendant also claims on appeal that the trial court's asserted error in admitting Kelly's statement violated his rights under the following provisions of the United States and California Constitutions: (1) the due process clauses of the Fifth and Fourteenth Amendments and article I, sections 7 and 15; (2) the impartial jury clause of the Sixth

## G. *Admission of Photograph of the Victim's Body at the Crime Scene*

At the guilt phase of the initial trial, outside the presence of the jury, the People sought to introduce into evidence People's exhibit No. 3, a photograph of Kelly's body at the crime scene taken from a distance, depicting Kelly in a pool of blood with articles of her clothing displaced and her body exposed, and People's exhibit No. 4, a similar photograph of Kelly's body at the crime scene taken close up, depicting Kelly with her throat slashed and with her body slashed from the chest through the belly and the pubic area toward the buttocks, opening the body cavity. Defendant objected that exhibits Nos. 3 and 4 both were inadmissible as irrelevant and unduly prejudicial. The trial court sustained defendant's objection to both exhibits and excluded them, but without prejudice to reconsidering their admissibility. Subsequently, outside the presence of the jury, the People again sought to introduce the two photographs, and defendant again objected on the same grounds. On defense counsel's representation that he would concede before the jury that defendant acted with malice aforethought and intent to kill, the trial court sustained defendant's objection to exhibit No. 4 and excluded it, but overruled defendant's objection to exhibit No. 3 and admitted it, determining in effect that it was relevant to the circumstances of the murder and not unduly prejudicial.

On appeal in *Griffin I*, we rejected defendant's contention that exhibit No. 3 was unduly prejudicial and should have been excluded. In our prior opinion, we observed that exhibit No. 3, "although . . . unpleasant and explicit, [was] clinical and was taken from quite some distance," whereas exhibit No. 4, which the trial court excluded, was "obviously more graphic and shocking." (*Griffin I, supra,* 46 Cal.3d at p. 1028.)

In the midst of the People's case in aggravation at the penalty phase retrial, outside the presence of the jury, defendant objected in anticipation of the People's seeking to introduce exhibits Nos. 3 and 4, which bore the same designations they had at the guilt phase of the initial trial, on the grounds of

Amendment and analogous clauses of article I, sections 15 and 16; (3) the confrontation clauses of the Sixth Amendment and article I, section 15; and (4) the cruel and unusual punishment clauses of the Eighth Amendment and of article I, section 17. Because these constitutional claims all are premised on the assertion that Kelly's statement was not admissible under Evidence Code section 1250, the claims clearly lack merit in light of our conclusion that Kelly's statement was properly admitted under that statute. Furthermore, although the United States Supreme Court's recent decision in *Crawford v. Washington* (2004) 541 U.S.36 [158 L.Ed.2d 177, 124 S.Ct. 1354]—decided after the briefing in this case—revises the applicable analysis of federal confrontation clause claims in some circumstances, *Crawford* does not affect the present case, because the out-of-court statement here at issue (made by the victim to a friend at school) is not "testimonial hearsay" within the meaning of *Crawford.* (See 541 U.S. at pp. 46 [124 S.Ct. at pp. 1364–1365, 1374].)

irrelevance and (especially) undue prejudice. The trial court overruled defendant's objection and stated it would admit both exhibits, in effect determining they were relevant to the circumstances of the murder and not unduly prejudicial. In addition, the trial court denied a request by defendant to admit only one of the two photographs, apparently exhibit No. 3. Subsequently, in the presence of the jury, the trial court admitted exhibits Nos. 3 and 4.

Defendant now contends that the trial court's admission of exhibit No. 4 was error. We disagree. The trial court reasonably determined that this exhibit was relevant and not unduly prejudicial, and therefore did not abuse its discretion. As for defendant's claim of irrelevance—which the People argue was not preserved, an assertion controverted by the record on appeal—exhibit No. 4 had a strong tendency to prove the circumstances of the murder, especially its brutality. As for defendant's claim of undue prejudice, exhibit No. 4 (as we implied in *Griffin I*) indeed is graphic and shocking, but so were defendant's crimes. Other evidence could, and did, depict Kelly's body at the crime scene, but none as clearly or as powerfully as this exhibit. The trial court reasonably determined that the probative value of the exhibit was not substantially outweighed by any threat it posed to the fairness of the trial or the reliability of the outcome. Defendant raises various complaints about exhibit No. 4—for example, that it is large and shows Kelly's bowels distended by gas formed after death—but he fails to demonstrate undue prejudice.[20]

### H. Admission of Evidence of Defendant's Employment at a Slaughterhouse

Prior to the penalty phase retrial, the People notified defendant that they intended to introduce evidence, not offered at the initial trial, of defendant's employment at the Palace Meat Company, a slaughterhouse, to establish the circumstances of the murder and specifically to prove that defendant slaughtered Kelly like an animal would be slaughtered.

Prior to opening statements, defense counsel, taking the position that evidence of defendant's employment at the Palace Meat Company would be inadmissible as irrelevant and unduly prejudicial, asked the trial court to instruct the prosecutor not to refer to such evidence in his opening statement

---

[20] Because we conclude that the admission of exhibit No. 4 was not erroneous, we also reject defendant's claim that the trial court's asserted error in admitting exhibit No. 4 violated his rights under the following provisions of the United States and California Constitutions: (1) the due process clauses of the Fifth and Fourteenth Amendments and, apparently, article I, sections 7 and 15; (2) the impartial jury clause of the Sixth Amendment and, apparently, the analogous clauses of article I, sections 15 and 16; and (3) the cruel and unusual punishment clauses of the Eighth Amendment and of article I, section 17.

in advance of a ruling on its admissibility, and the trial court so instructed the prosecutor. In the course of his opening statement, the prosecutor did not mention defendant's employment at the Palace Meat Company, but did make a comment—about which defense counsel later complained—that the "evidence will . . . show you that . . . [Kelly] was . . . [slaughtered] much like an animal is slaughtered . . . ."

Subsequently, outside the presence of the jury, the People sought a ruling from the trial court that evidence of defendant's employment at the Palace Meat Company was relevant to the circumstances of the murder and therefore admissible. Defendant opposed such a ruling on the ground that this evidence was irrelevant and unduly prejudicial.

At an evidentiary hearing conducted outside the presence of the jury, the People called David Kennedy, the owner of the Palace Meat Company, to give testimony relating to the business and defendant's employment there. The trial court deferred ruling on the admissibility of the evidence until it heard the testimony of Dr. Nelson, the pathologist.

As pertinent here, Dr. Nelson testified to the effect that the person who murdered Kelly rendered her unconscious by strangulation, stabbed her neck with a very sharp knife and then slashed her throat severing the carotid artery and causing exsanguination, and finally after death slashed the body in four strokes from the chest through the belly and the pubic area toward the buttocks, opening the body cavity. After hearing the testimony of Dr. Nelson, the trial court ruled evidence of defendant's employment at the Palace Meat Company admissible, determining expressly that it was not unduly prejudicial and impliedly that it was relevant.

In accordance with the trial court's ruling, the People, in their case in aggravation, called Kennedy as a witness. In pertinent part, Kennedy testified he was the owner of the Palace Meat Company. In the mid-1970's, Palace slaughtered sheep on an open kill-floor by rendering each animal unconscious with an electrical stun, stabbing its neck with a knife and then slashing its throat in order to sever the jugular vein and cause exsanguination, and finally after death slashing the body from the area of the hips where the legs join through the belly and the brisket toward the neck, opening the body cavity. In the mid-1970's, Palace employed defendant as a general helper, doing cleanup and similar chores. Although defendant did not himself slaughter sheep, he had the opportunity to observe the process.

Defendant contends the trial court's admission of the evidence of his employment at the Palace Meat Company was error. We reject his claim.

First, the trial court did not abuse its discretion in determining that the evidence of defendant's employment at the Palace Meat Company was

relevant in this case. The condition in which Kelly's body was found showed that defendant slaughtered her much like an animal would be slaughtered. The evidence in question had some tendency to prove that defendant treated Kelly more like an animal than a human being, and hence that he was more blameworthy on that basis.

Second, the trial court also did not abuse its discretion in determining that the evidence of defendant's employment at the Palace Meat Company was not unduly prejudicial. The evidence was brief, clear, and neutral, and as such its probative value properly could be found not to be substantially outweighed by any threat it posed to the fairness of the trial or the reliability of the outcome. Relying on *People v. Ortiz* (1979) 95 Cal.App.3d 926 [157 Cal.Rptr. 448], defendant asserts that the evidence was inflammatory. *Ortiz*, however, is clearly distinguishable. In the first place, *Ortiz* involved the admissibility of evidence at a noncapital trial, and evidence that is unduly prejudicial when offered at a noncapital trial or at the guilt phase of a capital trial is not necessarily unduly prejudicial in relation to the issue to be decided by the jury at the penalty phase of a capital trial. Second, *Ortiz* held only that the admission of evidence that a defendant engaged in ritual animal sacrifice to attack his credibility as a witness was unduly prejudicial, but the case does not suggest to us that the evidence in the present case was unduly prejudicial in establishing the circumstances of the murder. Defendant also asserts that the evidence risked confusing and misleading the jury, because it did not establish that defendant actually witnessed the slaughtering of sheep or that his killing of Kelly was conducted in a manner identical to that employed in the killing of sheep. But the circumstance that the evidence only suggested, and did not conclusively prove, that defendant slaughtered Kelly much like an animal is slaughtered goes not to its admissibility, but solely to its weight. Finally, contrary to defendant's assertion, the evidence was neither cumulative nor remote in time or logic.[21]

I. *Admission of Evidence of Defendant's Knowledge of Police Investigatory Procedures for Rape Offenses*

Outside the presence of the jury at the penalty phase retrial, defendant sought a ruling from the trial court that evidence of his knowledge of police investigatory procedures for rape offenses, not offered at the initial trial, was inadmissible as irrelevant and unduly prejudicial. The People had indicated their intent to present such evidence before introducing evidence suggesting

---

[21] Because we conclude this evidence properly was admitted, we reject defendant's related claims that the trial court's asserted error in admitting this evidence violated his rights under the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution and the due process clause of the Fourteenth Amendment. .

that defendant washed his genital area in a cell latrine following his commission of the crimes against Kelly. After an evidentiary hearing, the trial court ruled the evidence in question was admissible as relevant and not unduly prejudicial.

In their case in aggravation, the People called Edward Singh as a witness. In pertinent part, he testified as follows: Singh had been a police officer in Kerman for about 20 years. Some months prior to the murder, he and defendant worked at Cal Western Patrol, a security agency. On one occasion, defendant told him of a desire to become a police officer, and he and defendant then discussed how crimes, including rape, are investigated, and spoke of the gathering of evidence of pubic hair, semen, blood, and saliva from the victim's body by means of swabs.

Defendant contends that the trial court's admission of evidence of his knowledge of police investigatory procedures for rape offenses was error. We disagree. The trial court reasonably determined that the evidence in question was relevant and not unduly prejudicial, inasmuch as it was brief, clear, and neutral, and that this evidence suggested defendant washed his genital area in the cell latrine in order to destroy evidence and avoid apprehension. Contrary to defendant's assertion, the evidence did not "intimat[e] that . . . [he] was planning . . . [his] crimes all along, months before they took place," but only that he sought, after committing the crimes, to escape responsibility.[22]

J. *Admission of Evidence of Other Violent Criminal Activity by Defendant Involving Lewd Acts Committed Against Lisa B.*

 Prior to the penalty phase retrial, the People gave notice to defendant of their intent to present evidence, not introduced at the initial trial, of other violent criminal activity by him involving lewd acts committed against Lisa B. In reliance on the plurality opinion in *People v. Phillips* (1985) 41 Cal.3d 29, 72, footnote 25 [222 Cal.Rptr. 127, 711 P.2d 423], which was decided under the similar 1977 death penalty law, defendant requested that the trial court conduct a preliminary inquiry to determine whether there was substantial evidence to prove such other violent criminal activity—a condition for the admissibility of any evidence of that sort. Substantial evidence of other violent criminal activity is evidence that would allow a rational trier of fact to find the existence of such activity beyond a reasonable doubt. (See *People v. Rodrigues, supra,* 8 Cal.4th at pp. 1167–1168; *People v. Clair*

---

[22] Again, because we conclude this evidence properly was admitted, we reject defendant's related claim that the trial court's asserted error in admitting this evidence violated his rights under the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, the impartial jury clause of the Sixth Amendment, and the cruel and unusual punishment clause of the Eighth Amendment.

(1992) 2 Cal.4th 629, 672–678 [7 Cal.Rptr.2d 564, 828 P.2d 705]; see also *People v. Boyd* (1985) 38 Cal.3d 762, 778 [215 Cal.Rptr. 1, 700 P.2d 782].) Before an individual juror may consider evidence of other violent criminal activity in aggravation, he or she must find the existence of such activity beyond a reasonable doubt. (See *People v. Benson* (1990) 52 Cal.3d 754, 809–811 [276 Cal.Rptr. 827, 802 P.2d 330].) There is no requirement, however, that the jury as a whole unanimously find the existence of other violent criminal activity beyond a reasonable doubt before an individual juror may consider such evidence in aggravation. (See *ibid.*)

The trial court agreed to conduct a preliminary inquiry under *Phillips*. At the ensuing evidentiary hearing, Lisa was the sole witness. On direct examination, she testified in substance as follows: Lisa was a niece by marriage to Marvene Nordin, defendant's wife. Perhaps a year or two preceding the crimes committed against Kelly, when Lisa was four or five years of age, defendant engaged in lewd acts with her on two separate occasions. One time, he touched her around her vagina with his fingers, and the other time he penetrated her vagina with his fingers and then flicked open a knife with a folding blade; on each occasion, he threatened harm to others if she were to reveal what he had done. On cross-examination, Lisa admitted that defendant had an identical twin named Ronald Griffin, but stated she had been able to distinguish between defendant and Ronald whenever other persons called either man by his given name and also because defendant lived with Nordin and Ronald did not. She also admitted that at one time her mother had dated defendant and at another time Ronald. She further admitted that at some point she had reported that Ronald had sexually molested her, and that at another time she had made a similar report about an otherwise unidentified person. Finally, she conceded she could not date either of the two incidents or even state which occurred earlier and which later.

In arguing against the admissibility of the evidence of other violent criminal activity by defendant involving lewd acts committed against Lisa, defense counsel asserted at the outset that substantial evidence did not exist to prove the existence of such activity. Defense counsel alternately asserted that this evidence was unduly prejudicial because of its purported unreliability and its similarity to the charges of rape, sodomy, and lewd conduct alleged to have been committed by defendant against Kelly. Defense counsel also asserted that because of the purported lack of specificity in the details of the crimes, the evidence would violate what *People v. Jones* (1990) 51 Cal.3d 294 [270 Cal.Rptr. 611, 792 P.2d 643] refers to as a defendant's "right to present a defense" (*id.* at p. 317, italics omitted), arising from the accusation clause of the Sixth Amendment to the United States Constitution and, evidently, the due process clause of the Fourteenth Amendment.

The trial court ruled that the evidence of other violent criminal activity by defendant involving lewd acts committed against Lisa was admissible, stating that "there is substantial evidence for this matter to be heard by the jury," and that the People have the "obligation to prove these acts beyond a reasonable doubt."

In light of the trial court's ruling, the People, in their case in aggravation, called Lisa as a witness.

On direct examination, Lisa stated that she was 18 years of age. Marvene Nordin, who was Kelly's mother, was Lisa's aunt by marriage; Lisa knew Kelly and defendant, who then was Nordin's husband and Kelly's stepfather. When Lisa was four or five years of age—a year or two prior to the crimes committed against Kelly—she often visited defendant and Nordin's home, where Nordin sometimes would babysit for her. On two occasions during that period, defendant engaged in sexual conduct with her.

On one of these two occasions—Lisa could not remember which occurred earlier and which later—she was visiting defendant and Nordin's home. Defendant drove her in his truck to a store, pulled behind the establishment, and parked. Defendant told Lisa to take her pants off, and when she declined to do so he pulled them off himself. Defendant began to touch Lisa with his fingers in the area around her vagina, causing pain, and she began to cry; she asked him to stop, trying to push him away with her feet, but he did not. All of a sudden, defendant stopped, and Lisa apparently pulled up her pants; he then turned on the ignition, told her to lie on the floorboard, and she complied. Before arriving back at his home, defendant warned Lisa that if she told anyone about the incident, he would hurt Kelly, and Lisa became frightened. Lisa did not tell Nordin about the incident because she was afraid that defendant would hurt Kelly.

On the other occasion, Lisa again was visiting defendant and Nordin's home, sleeping in their bedroom in a nightshirt. When Lisa awoke, she left the room and found defendant sitting in a chair. After defendant told Lisa to sit by him, she drew near, and he put her on his lap. Defendant then fondled Lisa about her chest and legs, laid her down on the floor and laid himself nearby, and continued to fondle her, then proceeding to place his hand under her nightshirt toward the area around her vagina and finally penetrating her vagina with his fingers and causing pain. After some time, as defendant continued in this fashion, Lisa heard an automobile pull up in a driveway outside, and defendant stopped. Lisa heard a door of the vehicle shut. Defendant returned to the chair and flicked open a knife with a folding blade. Just then, the doorknob started to turn, and defendant warned Lisa that if she told the person entering the house about the incident, he would hurt her

mother and her father. The door opened, and Nordin came in. Lisa did not tell Nordin about the incident, because she was afraid of defendant. At some point after defendant murdered Kelly, Lisa disclosed both incidents to a person whom she did not identify.

On cross-examination, Lisa admitted that defendant had a twin named Ronald Griffin, but denied that she remembered defendant and Ronald to be identical twins. Lisa stated that she could distinguish between defendant and Ronald whenever other persons called either man by his given name; she also stated she could distinguish between the two because defendant lived with Nordin and Ronald did not, and also because she believed Ronald to be larger than defendant. Lisa also admitted that at one time her mother had dated defendant and at another time had dated Ronald. Lisa further admitted that at some point she had reported that Ronald had sexually molested her, and that at another she had made a similar report about an otherwise unidentified person. There apparently was no independent corroboration of the two incidents that Lisa described as occurring in defendant's truck and at his home.

Defendant now contends that the trial court erred in admitting the evidence of other violent criminal activity by him involving lewd acts committed against Lisa. For the reasons that follow, we reject this claim.

■ As stated, a trial court's ruling on the admissibility of evidence generally is reviewed for abuse of discretion. This standard applies in the specific context of evidence of other violent criminal activity. (See, e.g., *People v. Ochoa* (1998) 19 Cal.4th 353, 449 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Clair, supra,* 2 Cal.4th at p. 676.)

The trial court reasonably determined that substantial evidence existed to prove other violent criminal activity by defendant involving lewd acts committed against Lisa. A rational trier of fact could have credited Lisa's testimony, which generally was detailed, internally consistent, and not in conflict with any other evidence presented, and was sufficient to support a finding beyond a reasonable doubt that defendant touched Lisa around her vagina with his fingers in the incident in his truck and penetrated her vagina with his fingers in the incident at his home. Both episodes involved violence by means of defendant's accompanying "express . . . threat[s] to use . . . violence" (§ 190.3, factor (b))—against Kelly in the former incident and against Lisa's mother and father in the latter incident.

■ The trial court also reasonably determined that the evidence of other violent criminal activity by defendant involving lewd acts committed against Lisa was not unduly prejudicial. Although a trial court may not

categorically exclude evidence of other violent criminal activity on the ground of undue prejudice, inasmuch as evidence of this sort is "expressly made admissible" (*People v. Karis, supra,* 46 Cal.3d at p. 641; accord, *People v. Box* (2000) 23 Cal.4th 1153, 1200–1201 [99 Cal.Rptr.2d 69, 5 P.3d 130]), it may exclude "particular items of [such] evidence" on that ground (*People v. Karis, supra,* 46 Cal.3d at p. 641, fn. 21), insofar as any item might "unfairly persuade[]" the trier of fact to find that the defendant engaged in the other violent criminal activity in question (*People v. Box, supra,* 23 Cal.4th at p. 1201). The record precludes any characterization of Lisa's testimony as unfairly persuasive, in that it generally was detailed, internally consistent, and not in conflict with any other evidence presented.

 Lastly, the trial court reasonably determined that the evidence of other violent criminal activity by defendant involving lewd acts committed against Lisa would not violate defendant's right to present a defense under the Sixth Amendment's accusation clause and the Fourteenth Amendment's due process clause. In *Jones,* we concluded that a lack of specificity in the details of crimes like those committed by defendant against Lisa does not "inevitably preclude a defense." (*People v. Jones, supra,* 51 Cal.3d at p. 319.) The issue usually turns on the relative credibility of the defendant and the child, both generally and in the situation of the so-called resident child molester (*ibid.*) who either lives with, or has continuous access to, the child (*id.* at p. 299). "[T]he defendant has the option of taking the witness stand and directly denying any wrongdoing. If credible, his testimony should prevail over the unspecific assertions of [the child]. In some cases, the very nonspecificity of the child's testimony, especially if uncorroborated, may offer defense counsel fertile field for challenging the child's credibility." (*Id.* at p. 320.) Here, although Lisa's testimony was lacking in specificity as to the date of the incidents in defendant's truck and at his home, it otherwise was quite specific, with Lisa describing precisely what defendant did to her. In any event, on cross-examination defense counsel challenged Lisa's credibility by suggesting misidentification or perhaps confabulation. Although defendant did not take the witness stand to deny Lisa's testimony, his choice to proceed in that fashion does not reflect any violation of his right to present a defense, but rather a decision to present a defense in a certain way, by relying upon defense counsel's cross-examination of Lisa.[23]

---

[23] Because we conclude the evidence of other violent criminal activity against Lisa properly was admitted, we reject defendant's related claims that the trial court's asserted error in admitting this evidence violated his rights under the following provisions of the United States and California Constitutions: (1) the due process clauses of the Fourteenth Amendment and article I, section 15; (2) the accusation clauses of the Sixth Amendment and article I, section 14; (3) the confrontation clauses of the Sixth Amendment and article I, section 15; (4) the compulsory process clauses of the Sixth Amendment and article I, section 15; (5) the cruel and unusual punishment clauses of the Eighth Amendment and of article I, section 17; and (6) the equal protection clauses of the Fourteenth Amendment and article I, section 7.

### K. *Refusal of Request to Instruct on the Penetration Element of Rape and Sodomy*

In its charge to the jury at the penalty phase retrial, the trial court instructed, in pertinent part, that "[t]he defendant in this case has been found guilty of murder of the first degree. The allegation that the murder was committed under the special circumstances that the murder was committed while the defendant was engaged in the commission of rape, while the defendant was engaged in the commission of sodomy, and while the defendant was engaged in the commission of a lewd act with a child, has been specially found to be true."[24] The trial court also instructed that "[i]f you the Jury, individually *or* collectively, entertains any lingering doubt as to the defendant's guilt as to the conviction and/or special circumstance findings, you may weigh and consider such doubt in deciding what sentence is appropriate." The trial court, however, refused a request by defendant to instruct on the elements of murder, rape, and sodomy, or in the alternative to instruct at least on the penetration element of rape and sodomy, determining in substance that to do so might confuse the jury by inviting it to relitigate the related special circumstance findings and underlying convictions.

Defendant contends that the trial court's refusal of his request to instruct on the penetration element of rape and sodomy was error.

We conclude that there is no need to determine whether the trial court erred in declining to give the requested instruction on penetration, because assuming, without deciding, that the trial court did err in failing to give such an instruction on request, we conclude that the error was not prejudicial in this case under any standard of prejudice. We reach this conclusion because (1) defendant was permitted to present evidence in mitigation to support his contention that there was a lingering doubt whether he had effected penetration and thereby committed rape and sodomy, (2) both counsel in their penalty phase closing arguments clearly discussed the evidence relating to penetration and the lingering doubt issue, and (3) there was no suggestion, either by the court or counsel, that penetration was not an element or an essential feature of the crimes of rape and sodomy. Under these circumstances, the absence of an instruction informing the jury, for purposes of the lingering doubt issue, that penetration is an element of the offenses of rape and robbery was harmless beyond a reasonable doubt.[25]

---

[24] Prior to jury selection, the trial court had instructed the prospective jurors to the effect that, "as a matter of law, . . . the defendant is guilty of murder and the special circumstances found true . . . ."

[25] In light of our conclusion that the absence of an instruction on the penetration element of rape and sodomy was harmless beyond a reasonable doubt, we reject defendant's claim that the trial court's failure to give such an instruction constituted reversible error under the Sixth,

### L. *Failure to Instruct Against Double-counting of Assertedly Overlapping Special Circumstances and Underlying Crimes*

At the penalty phase retrial, the trial court instructed the jury that "[i]n determining which penalty is to be imposed on the defendant, you shall consider all of the evidence . . . [and] shall consider, take into account and be guided by . . . [specified penalty] factors" including "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding"— namely, the murder of Kelly and the accompanying rape, sodomy, and lewd conduct—and "the existence of any special circumstances found to be true"—that is, felony-murder rape, felony-murder sodomy, and felony-murder lewd conduct.

In his opening brief, defendant contends that the trial court erred by failing to modify the above-quoted instruction in order to prevent the jury from double-counting the assertedly overlapping special circumstances—felony-murder lewd conduct vis-à-vis felony-murder rape and felony-murder sodomy—and the assertedly overlapping underlying crimes—lewd conduct vis-à-vis rape and sodomy. Defendant asserts that this error improperly inflated evidence in aggravation over that in mitigation. In their brief, the People argue that defendant did not preserve any such claim for review on appeal, because he failed to request any modification to avoid the consequences of which he now complains and because the instruction actually given was correct and applicable. In his reply brief defendant has withdrawn his contention, in light of the People's argument. Accordingly, we need not address or resolve this claim.

### M. *Refusal of Request to Instruct on Mercy*

At the penalty phase retrial, as stated above, the trial court instructed the jury that "[i]n determining which penalty is to be imposed on the defendant, you shall consider all of the evidence . . . [and] shall consider, take into account and be guided by . . . [specified penalty] factors" including, as pertinent here, "[a]ny sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." The trial court also instructed the jury that "[y]ou are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." The court, however, denied a

---

Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 15, 16, and 17 of the California Constitution.

To the extent defendant claims that the trial court erred by refusing his request to instruct on the elements of murder, rape, and sodomy generally, and not solely on the penetration element of rape and sodomy, we dismiss his claim as "not properly raised: it is perfunctorily asserted without argument in support." (*People v. Ashmus, supra,* 54 Cal.3d at p. 985, fn. 15.)

request by defendant to give a number of instructions stating or suggesting that the jury could exercise mercy based on the evidence, in part because some of these requested instructions were duplicative of those quoted above. In their respective closing arguments, defense counsel explicitly urged the jury to exercise mercy and the prosecutor implicitly urged the jury not to do so.

Defendant contends that the trial court's denial of his request to instruct the jury that it could exercise mercy based on the evidence was error. We have rejected substantially similar claims in the past (see, e.g., *People v. Smith* (2003) 30 Cal.4th 581, 638 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Hughes* (2002) 27 Cal.4th 287, 403 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Lewis* (2001) 26 Cal.4th 334, 393 [110 Cal.Rptr.2d 272, 28 P.3d 34]), and we reject the present claim as well. A trial court, of course, may refuse an instruction that is duplicative. (E.g., *People v. Sanders* (1995) 11 Cal.4th 475, 560 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Mickey* (1991) 54 Cal.3d 612, 697 [286 Cal.Rptr. 801, 818 P.2d 84]; see, e.g., *People v. Benson, supra,* 52 Cal.3d at p. 805, fn. 12.) The question of the appropriate standard of review applicable to a determination of duplicativeness need not be resolved (see *People v. Berryman* (1993) 6 Cal.4th 1048, 1079 [25 Cal.Rptr.2d 867, 864 P.2d 40]), because even when scrutinized independently, the trial court's decision was sound. The instructions requested were clearly duplicative of the instructions given, which informed the jury that it had to "consider all of the evidence" and could "consider, take into account and be guided by" any factor, including "[a]ny sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death," and that the jury was "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." (See, e.g., *People v. Smith, supra,* 30 Cal.4th at p. 638; *People v. Hughes, supra,* 27 Cal.4th at p. 403; *People v. Lewis, supra,* 26 Cal.4th at p. 393 .)

Defendant argues that without the instructions he requested, a reasonable likelihood exists (see *People v. Clair, supra,* 2 Cal.4th at p. 663) that the jury was misled into believing it was precluded from considering and giving effect to at least some of the evidence that he presented in mitigation, in violation of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution and the due process clause of the Fourteenth Amendment. But having received an instruction expressly declaring that it had to "consider all of the evidence" and could "consider, take into account and be guided by" any factor including "[a]ny . . . aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than

death," the jury adequately was advised that it could consider and give effect to *all* of the evidence presented by defendant in mitigation.[26]

### N. *Instruction on the Determination of Penalty*

With regard to the determination of penalty, the trial court instructed the jury at the penalty phase retrial, apparently at the request of defendant as well as the People, as follows:

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant.

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

"The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it [*sic*] warrants death instead of life without parole."

Defendant contends that the trial court's giving of the foregoing instruction was constitutionally deficient in various respects—each of which, he acknowledges, we have rejected in prior decisions in passing upon substantially similar instructions.

---

[26] To the extent defendant claims the jury could exercise mercy *apart from the evidence*, and should have been instructed accordingly, the contention lacks merit. A jury may not exercise mercy in this fashion, and therefore should not be instructed that it could. (*People v. Benson, supra*, 52 Cal.3d at pp. 808–809.)

 The standard of review for the legal correctness of an instruction is independent, inasmuch as the "question is one of law, involving as it does the determination of the applicable legal principles." (*People v. Berryman, supra,* 6 Cal.4th at p. 1089.)

First, defendant challenges this sentence of the instruction: "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are *so substantial* in comparison with the mitigating circumstances that it [*sic*] *warrants* death instead of life without parole." (Italics added.) Defendant argues, in substance, that the Eighth Amendment's cruel and unusual punishment clause and the Fourteenth Amendment's due process clause prohibit vagueness in guiding the jury and require reliability for any decision made, that the words "so substantial" rendered the instruction vague, and that the word "warrants" made the ensuing verdict of death unreliable. In *People v. McPeters* (1992) 2 Cal.4th 1148, 1194 [9 Cal.Rptr.2d 834, 832 P.2d 146], and *People v. Breaux* (1991) 1 Cal.4th 281, 315–316 [3 Cal.Rptr.2d 81, 821 P.2d 585], we rejected a similar attack on the asserted operation of the words "so substantial" and "warrants," respectively, and we again do so now.

Second, defendant challenges the failure of the instruction to state that the People bear the burden of proving beyond a reasonable doubt that death is the appropriate penalty. Defendant argues that the Fourteenth Amendment's due process clause imposes such a burden. In *People v. Berryman, supra,* 6 Cal.4th at page 1101, however, we held to the contrary, and we adhere to that holding.

Third, defendant similarly challenges the failure of the instruction to state that in order to return a verdict of death, the jury must find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances and that death is the appropriate penalty. Defendant argues that the Fourteenth Amendment's due process clause imposes such a requirement on the jury. But in *People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118], we concluded that the United States Constitution, including implicitly the Fourteenth Amendment's due process clause, does not impose any requirement of this sort, and we so conclude again.

Fourth, defendant challenges the failure of the instruction to state that in order to return a verdict of death, the jury must be unanimous in finding any aggravating circumstance underlying the verdict and must provide a written statement of reasons. Defendant argues, by implication, that the Eighth Amendment's cruel and unusual punishment clause and/or the Fourteenth Amendment's due process clause demand such a finding and statement of reasons from the jury. In *People v. Pride* (1992) 3 Cal.4th 195

[10 Cal.Rptr.2d 636, 833 P.2d 643], however, we impliedly held to the contrary, and now do so expressly.

Fifth, defendant challenges the sentence of the instruction defining a mitigating circumstance as "any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." Defendant argues that the Eighth Amendment's cruel and unusual punishment clause and the Fourteenth Amendment's due process clause, as construed in *Lockett v. Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 98 S.Ct. 2954], generally require that the jury "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," but that the definition of a mitigating circumstance incorporated in the instruction precluded the jury from giving such consideration. Although we agree with defendant concerning what is required by the two federal constitutional provisions in question, we otherwise disagree. A mitigating circumstance must not be reviewed in isolation, but rather in the context of the charge as a whole. (See, e.g., *People v. Reliford* (2003) 29 Cal.4th 1007, 1013 [130 Cal.Rptr.2d 254, 62 P.3d 601].)

After such review, we conclude that no reasonable likelihood exists that the jury misunderstood or misapplied the definition of a mitigating circumstance as argued by defendant. The instruction made clear that "[i]n determining which penalty is to be imposed on the defendant," the jury had to "consider all of the evidence" and could "consider, take into account and be guided by" any factor, including "[a]ny sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." Defendant's citation of studies purportedly showing or suggesting the generally imperfect understanding of the concept of "mitigation" fails to establish any reasonable likelihood that the definition of a mitigating circumstance in this case misled the jury as to the scope of its responsibility in choosing between the two possible punishments.

Defendant asserts that, in light of the decisions of the United States Supreme Court in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], we must reconsider any adverse conclusion that we otherwise might be inclined to reach on any aspect of his claim.

In *Apprendi*, the court held that the Fourteenth Amendment's due process clause requires the state to submit to a jury, and prove beyond a reasonable

doubt to the jury's unanimous satisfaction, every fact, other than a prior conviction, that increases the punishment for a crime beyond the maximum otherwise prescribed under state law. In *Ring*, the court held that *Apprendi* operates in the capital context.

■ Contrary to defendant's assertion, as we recently made plain in *People v. Prieto* (2003) 30 Cal.4th 226, 262–263 [133 Cal.Rptr.2d 18, 66 P.3d 1123], *Ring* and *Apprendi* are inapplicable to the determination of penalty in a capital case under California law. Under the law of this state, all of the facts that increase the punishment for murder of the first degree—beyond the otherwise prescribed maximum of life imprisonment with possibility of parole to *either* life imprisonment without possibility of parole *or* death— already have been submitted to a jury (and proved beyond a reasonable doubt to the jury's unanimous satisfaction) in connection with at least one special circumstance, prior to the commencement of the penalty phase. (See § 190.2.) Therefore, at the penalty phase itself no further facts need to be proved in order to increase the punishment to either death or life imprisonment without possibility of parole, because both now are prescribed as potential penalties. It is true that at the penalty phase, the choice between death and life imprisonment without possibility of parole depends on a determination as to which of the two penalties is appropriate, which in turn depends on a determination whether the evidence in aggravation substantially outweighs that in mitigation. (See, e.g., *People v. Brown* (1985) 40 Cal.3d 512, 538–545 [230 Cal.Rptr. 834, 726 P.2d 516], & especially fns. 13 & 19 on pp. 541–542 & 545, revd. on other grounds *sub nom. California v. Brown* (1986) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].) But as explained, the ultimate determination of the appropriateness of the penalty and the subordinate determination of the balance of evidence of aggravation and mitigation do not entail the finding of facts that can increase the punishment for murder of the first degree beyond the maximum otherwise prescribed. Moreover, those determinations do not amount to the finding of facts, but rather constitute a single fundamentally normative assessment (see, e.g., *People v. Boyde* (1988) 46 Cal.3d 212, 252–255 [250 Cal.Rptr. 83, 758 P.2d 25], affd. *sub nom. Boyde v. California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]) that is outside the scope of *Ring* and *Apprendi*. (Cf. *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 432, 437 [149 L.Ed.2d 674, 121 S.Ct. 1678] [holding that an "award of punitive damages does not constitute a finding of 'fact[]' ": "imposition of punitive damages" is not "essentially a factual determination," but instead an "expression of . . . moral condemnation"].)[27]

---

[27] To the extent defendant claims that by giving the instruction on the determination of penalty quoted in the text, the trial court erred under the Fifth and Sixth Amendments to the United States Constitution and article I, sections 7 and 15 of the California Constitution, as well as under the Eighth Amendment's cruel and unusual punishment clause and the

### O. *Constitutionality of the 1978 Death Penalty Law*

Defendant contends that the 1978 death penalty law violates the United States and California Constitutions, both on its face and as applied, by failing adequately to narrow the class of murderers subject to the death penalty, and hence that the sentence of death imposed upon him is invalid on that ground. Specifically, defendant claims that the death penalty law fails adequately to narrow the class of death-eligible murderers because the law (1) defines murder of the first degree in a vague and overbroad fashion, in violation of the cruel and unusual punishment clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment, and (2) impermissibly leaves the narrowing function to prosecutorial discretion, in violation of the due process clauses of the Fifth and Fourteenth Amendments, the cruel and unusual punishment clause of the Eighth Amendment, and the equal protection clause of the Fourteenth Amendment, as well as the due process clauses of article I, sections 7 and 15, the cruel or unusual punishment clause of article I, section 17, and the equal protection clause of article I, section 7.

In *People v. Hughes, supra,* 27 Cal.4th at pages 403–404, we concluded that the death penalty law in fact adequately narrows the class of death-eligible murderers. There, we rejected a claim substantially similar to defendant's. Here, defendant adds only a bare invocation, without argument, of the federal and state constitutional guaranties of equal protection. Accordingly, we reject defendant's claim as well. Lastly, in light of the crimes of which he was convicted, which included rape, sodomy, and lewd conduct in addition to murder and the special circumstances found true (which comprised felony-murder rape, felony-murder sodomy, and felony-murder lewd conduct), defendant is squarely within the class of death-eligible murderers, no matter how narrowly that class reasonably might be defined.

Defendant also contends that the 1978 death penalty law violates the United States Constitution, both on its face and as applied, by failing to provide for intercase proportionality review—specifically violating the Fifth Amendment's due process clause, the Eighth Amendment's cruel and unusual punishment clause, the Fourteenth Amendment's due process and equal protection clauses, and some unidentified clause of the Sixth Amendment. In *People v. Frye* (1998) 18 Cal.4th 894, 1029 [77 Cal.Rptr.2d 25, 959 P.2d 183], we held that the United States Constitution, including explicitly the Fifth, Sixth, Eighth, and Fourteenth Amendments, does not require intercase proportionality. Presented with no reason to reconsider our holding, we adhere to it in this case and accordingly reject defendant's claim.

---

Fourteenth Amendment's due process clause, defendant's argument is dismissed as not properly raised, inasmuch as it is perfunctorily asserted without argument in support.

Defendant contends that the 1978 death penalty law violates the United States and California Constitutions, both on their face and as applied, in several additional particulars, each of which he acknowledges we have rejected in other decisions. Defendant also claims that instructions given in this case in conformity with the death penalty law are themselves violative of the federal and state Constitutions in various respects, each of which he likewise acknowledges we have rejected in passing upon substantially similar instructions elsewhere.

First, defendant claims that the 1978 death penalty law, and the instructions given, violate the Eighth Amendment's cruel and unusual punishment clause and the Fourteenth Amendment's due process clause by failing to identify which penalty factors are aggravating and which penalty factors are mitigating. In *People v. Rodriguez* (1986) 42 Cal.3d 730, 777–779 [230 Cal.Rptr. 667, 726 P.2d 113], we held that the United States Constitution, including implicitly the provisions on which defendant relies, does not require any such identification of aggravating and/or mitigating penalty factors. We come to the same conclusion expressly in the present case. Defendant argues that *Ring* and *Apprendi* require us to reconsider this point, but we conclude they do not, because as we have explained these decisions are inapplicable to the determination of penalty in a capital case under California law. Further, in *People v. Fudge* (1994) 7 Cal.4th 1075, 1126–1127 [31 Cal.Rptr.2d 321, 875 P.2d 36], we upheld substantially similar instructions against a substantially similar attack. The United States Constitution does not require the identification of aggravating and/or mitigating penalty factors in the instructions given to the jury, or elsewhere.

Second, defendant claims that the 1978 death penalty law, and the instructions given, violate the Sixth Amendment's jury trial clause, the Eighth Amendment's cruel and unusual punishment clause, and the Fourteenth Amendment's due process and equal protection clauses, by failing to impose on the People the burden of proving beyond a reasonable doubt that any given aggravating circumstance exists, that the aggravating circumstances outweigh the mitigating circumstances, and that death is the appropriate penalty. Rejecting a like challenge to the death penalty law in *People v. Marshall* (1990) 50 Cal.3d 907, 935–936 [269 Cal.Rptr. 269, 790 P.2d 676], where the defendant's argument differed only in its omission of any reference to the Sixth Amendment, we concluded that the Eighth and Fourteenth Amendments do not impose any burden of that sort. We now reject defendant's challenge as well, finding that its invocation of the Sixth Amendment adds nothing of substance, because defendant erroneously assumes (as noted above) that *Ring* and *Apprendi* are applicable to the determination of penalty in a capital case under California law. In *Marshall*, we also rejected a similar challenge to substantially identical instructions.

Third, defendant claims that the 1978 death penalty law, and the instructions given, violate the Sixth Amendment's jury trial clause, the Eighth Amendment's cruel and unusual punishment clause, the Fourteenth Amendment's due process and equal protection clauses, and the analogous provisions of, apparently, article I, sections 7, 15, 16, and 17, by failing to require that in order to return a verdict of death, the jury must be unanimous in finding any aggravating circumstance underlying the verdict. In *People v. Cox* (1991) 53 Cal.3d 618, 691–692 [280 Cal.Rptr. 692, 809 P.2d 351], we concluded that neither the United States Constitution nor the California Constitution, including implicitly the provisions invoked in the present case, imposes any such requirement on the jury, and we adhere to that conclusion here. Moreover, in *People v. Bacigalupo* (1991) 1 Cal.4th 103, 147 [2 Cal.Rptr.2d 335, 820 P.2d 559], vacated on other grounds *sub nomine Bacigalupo v. California* (1992) 506 U.S. 802 [121 L.Ed.2d 5, 113 S.Ct. 32], we specifically held that the Sixth Amendment does not impose any requirement of this sort. Defendant asks us to reconsider our holding in light of *Ring* and *Apprendi*. There is, however, no reason for us to do so, because—as we have explained—*Ring* and *Apprendi* are inapplicable to the determination of penalty in a capital case under California law.

Fourth, defendant claims that the 1978 death penalty law, and the instructions given, violate the Eighth Amendment's cruel and unusual punishment clause, the Fourteenth Amendment's due process clause, and apparently the Fifth Amendment's due process clause and the Sixth Amendment's jury trial clause, by defining two of the penalty factors in terms of "[w]hether or not the offense was committed while the defendant was under the influence of *extreme* mental or emotional disturbance" (§ 190.3, factor (d), italics added) and "[w]hether or not *at the time of the offense* the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was *impaired* as a result of mental disease or defect, or the affects of intoxication" (§ 190.3, factor (h), italics added). Defendant's argument is to the effect that the terms "extreme" and "impairment at the time of the offense" have a limiting effect and therefore are at odds with the Eighth Amendment's cruel and unusual punishment clause and the Fourteenth Amendment's due process clause, which as noted generally require that the jury "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (*Lockett v. Ohio, supra*, 438 U.S. at p. 604). But in *People v. Brown, supra*, 40 Cal.3d at pages 540–541, we construed the death penalty law to allow just such consideration. The instructions in the present case, as quoted above, were expressly in accord with these requirements. Notwithstanding defendant's complaint, there is no reasonable likelihood that the jury understood or applied the terms "extreme" or "impairment at the time of the offense" in

isolation so as to preclude the jury from considering all that it was permitted to consider in support of the penalty of life imprisonment without possibility of parole rather than death. To the extent defendant argues that the term "extreme" is impermissibly vague for purposes of the death penalty law and the instructions given, and thus violates the Eighth Amendment's cruel and unusual punishment clause and the Fourteenth Amendment's due process clause among other provisions, we found such an argument unpersuasive in *People v. Taylor* (2001) 26 Cal.4th 1155, 1179 [113 Cal.Rptr.2d 827, 34 P.3d 937], and adhere to that position in the present case.

Fifth, defendant claims that the 1978 death penalty law, and the instructions given, violate the Eighth Amendment's cruel and unusual punishment clause, the Fourteenth Amendment's due process clause, the due process clauses of article I, sections 7 and 15, and the cruel or unusual punishment clause of article I, section 17, by failing to establish a presumption that life imprisonment without possibility of parole is the appropriate penalty in any given case. In *People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980], we concluded in effect that neither the United States nor the California Constitution requires such a presumption. We adhere to that conclusion and on that basis reject defendant's reliance on the specific federal and state constitutional provisions he cites. Contrary to defendant's implication, *Ring* and *Apprendi* have no bearing on the conclusion we reach, because, as explained above, they are inapplicable to the determination of penalty in a capital case under California law.

Sixth, defendant claims that the 1978 death penalty law, and the instructions given, violate the Fifth Amendment's due process clause, the Eighth Amendment's cruel and unusual punishment clause, the Fourteenth Amendment's due process clause, and, apparently, the Sixth Amendment's jury trial clause, to the extent the law allows the admission, and the instructions allowed the consideration, of evidence of other violent criminal activity that did not result in a conviction. In *People v. Holt* (1997) 15 Cal.4th 619, 701 [63 Cal.Rptr.2d 782, 937 P.2d 213], we explicitly rejected a claim similar to defendant's, impliedly concluding that the Fifth, Sixth, Eighth, and/or Fourteenth Amendments do not prohibit the admission or consideration of such evidence. Presented with no reason to do otherwise, we adhere to that conclusion and therefore reject defendant's argument.

P. *Cumulative Error*

Defendant contends that all of the errors assertedly committed at the penalty phase retrial, considered together, require reversal of the judgment, because they cumulatively resulted in prejudicial violations of both the United States and California Constitutions—specifically, the cruel and unusual punishment clause of the Eighth Amendment and the due process and

equal protection clauses of the Fourteenth Amendment, as well as the due process clauses of article I, sections 7 and 15, the equal protection clause of article I, section 7, and the cruel or unusual punishment clause of article I, section 17.

With only one exception, we have rejected all of defendant's claims of error. With respect to the claim that the trial court erred in failing to instruct the jury on penetration as an element of rape and sodomy in connection with defendant's lingering doubt claim, we have assumed, without deciding, that the failure was error, and have found that any error in this regard was harmless beyond a reasonable doubt. (*Ante*, pp. 589–590.) Because there is no additional error to "cumulate" with that determination, defendant's claim of cumulative error is clearly without merit.

### III. DISPOSITION

For the reasons stated above, the judgment is affirmed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.